**Georgia STROUD, George Edward Stroud, and James Carter Stroud, Appellants, and Charles W. Stroud, Jr., Respondent,**

**v.**

**George ZUZICH d/b/a Zuzich Truck Lines and Pacific Employers Insurance Company, Respondents, and Byers Transportation Company, Inc., and Anchor Casualty Company, Appellants.**

No. 43992.

Supreme Court of Missouri.

Division No. 1.

Sept. 13, 1954.

Motion for Rehearing or to Transfer to Court en Banc Denied Oct. 11, 1954.

John M. Langsdale, Leo T. Schwartz, Kansas City, John A. McGuire, Kansas City, of counsel, for plaintiffs-appellants.

Henry W. Buck, W. H. Curtis, Wallace Becker, Kansas City, Morrison, Hecker, Buck, Cozad & Rogers, Kansas City, of counsel, for appellants, Byers Transp. Co., Inc., and Anchor Cas. Co.

Irving Kuraner, Kansas City, Kuraner, Freeman & Kuraner, Kansas City, of counsel, for respondents, George Zuzich d/b/a Zuzich Truck Lines and Pacific Emp. Ins. Co.

VAN OSDOL, Commissioner.

In this workmen's compensation case, two claims for compensation under the Workmen's Compensation Law were filed. Claimants in Claim No. 1 are the widow of the deceased employee and employee's minor sons, George Edward and James Carter Stroud. Claimant in Claim No. 2 is Charles W. Stroud, Jr., who alleged he also was a minor son and dependent of employee. Both of the claims were against George Zuzich, doing business as Zuzich Truck Lines, and his insurer, and against Byers Transportation Company, Inc., and its insurer. According to the briefs of the parties, appellants and respondents, the principal question to be determined by the Commission was whether employee Charles W. Stroud was the employee of Zuzich at the time of the fatal accident or whether he, in the circumstances shown in evidence, became the employee, under the borrowed servant doctrine, of Byers Transportation Company.

A referee of the Division of Workmen's Compensation made an award in favor of claimants in Claim No. 1. The referee found that employee died as a result of injuries received in an accident arising out of and in the course of his employment with George Zuzich (Zuzich Truck Lines) and that employee was not the employee of Byers Transportation Company at the time of the accident. The referee also found that claimant in Claim No. 2 had failed to prove he was a dependent of employee. Claimants in Claim No. 1 were awarded total death benefits in the sum of $12,000, and the widow was allowed the further sum of $150 for burial expense.

Applications for review were filed by claimant in Claim No. 2, Charles W. Stroud, Jr., and by George Zuzich (Zuzich Truck Lines) and his insurer; and upon review by the Industrial Commission the award adverse to claimant in Claim No. 2 was reversed, and he was found to have been a dependent of employee. The Industrial Commission affirmed the referee's award in favor of claimants in Claim No. 1, but modified the same to make a difference in the amounts of weekly installments to the several claimants in accommodation of the finding that claimant Charles W. Stroud, Jr., was also a dependent of the employee.

Thereafter appeals were perfected to the Circuit Court of Saline County by George Zuzich and his insurer, and by claimants in Claim No. 1. Upon review the Circuit Court found there was not sufficient competent evidence to warrant the award of the Industrial Commission as against George Zuzich and his insurer, and found there was not sufficient competent evidence to warrant the Industrial Commission's award in favor of Byers Transportation Company and its insurer. Accordingly, the circuit court reversed the award the Industrial Commission had made against George Zuzich and his insurer, and reversed the award in favor of Byers Transportation Company and its insurer, in effect making an award in favor of the claimants in both claims and against Byers Transportation Company and its insurer. (In their brief herein, claimants Georgia, George Edward, and James Carter Stroud, appellants, have abandoned their cross-appeal from that part of the judgment affirming the Commission's finding that Charles W. Stroud, Jr., was a dependent of employee, and herein make no further contention that the circuit court erred in affirming the award and finding of the Industrial Commission as to that issue.)

"In reviewing this workmen's compensation case we have the duty of determining whether the Commission's award is supported by competent and substantial evidence upon the whole record. Const. Art. 5, § 22, V.A.M.S. This does not mean that we may substitute our own judgment on the evidence for that of the Commission. But we are authorized to decide whether the Commission could have reasonably made its findings and reached its result, upon a consideration of all of the evidence before it, and to set aside its decision if clearly con-

trary to the overwhelming weight of the evidence. Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S.W.2d 647." Foster v. Aines Farm Dairy Co., Mo.Sup., 263 S.W.2d 421, 423. We shall examine the evidence as transcribed in the voluminous record.

█ It was admitted that employee Charles W. Stroud was accidentally injured on March 6, 1950, while driving a tractor which was pulling a trailer over U. S. Highway No. 40 just east of Marshall Junction, from which injury he died the following day. It was admitted that George Zuzich, doing business under the name of Zuzich Truck Lines, was a major employer operating under the Workmen's Compensation Law, and that his liability was insured by Pacific Employers Insurance Company. (Hereinafter we shall sometimes refer to employer George Zuzich and his insurer respondents, as "Zuzich.") It was further admitted that Byers Transportation Company, Inc., was a major employer operating under the Law and that its liability was insured by Anchor Casualty Company. (Hereinafter we shall sometimes refer to Byers Transportation Company, Inc., and its insurer, appellants, as "Byers.")

Zuzich was engaged in trucking as a "contract hauler." Section 390.020, subd. 3, RSMo 1949, V.A.M.S. Zuzich operated under a contract hauler's permit issued by the Public Service Commission of Missouri to haul fresh meat and other food products, and only for the firms or shippers stated on the back of his contract hauler's permit. Byers was operating as a "motor carrier", that is, Byers was operating motor vehicles in transporting property for hire as a common carrier, Section 390.020, subd. 2, RSMo 1949, V.A.M.S., under a certificate of the Public Service Commission of Missouri authorizing it to so operate on U. S. Highway No. 40 between the points of St. Louis and Kansas City (and over other routes serving other points). Byers was also operating as a motor carrier under Interstate Commerce Commission authority.

April 18, 1949, employee, Charles W. Stroud, and Zuzich had entered into a contract by which Stroud leased his Ford tractor to Zuzich. Another contract of lease between employee, lessor, and Zuzich, lessee, was entered into February 1, 1950. The latter contract was almost identical with the former. The latter contract was in force at the time of the fatal accident. The contract stipulated a minimum rate of rental for the tractor; and there was a contemporaneous verbal contract stipulating that employee was to be paid a salary or wages. Provisions of the contract of lease pertinent to this review are as follows,

"1. The above described equipment shall be used in the business of the Lessee, being operated under his Permits, both Federal and State, and said equipment shall be operated under and according to the present and future applicable rules and regulations of the various States within, into, or through which said equipment may be operated. It is agreed by and between the parties hereto that nothing herein contained or provided shall be construed as the granting or vesting to the Lessor, of any right, privilege, license, certificate or permit as a motor carrier. * * *

"6. Lessee shall have the exclusive right to contract for any and all freight hauled with such equipment, and to determine the class or classes of freight to be handled; for whom the same shall be hauled; the point of origin and destination thereof and the route or routes to be employed, and the refusal of the Lessor hereunder to haul or handle any load or partial load shall be considered a breach of this agreement and cancel this contract. * * *"

Under such a lease, a driver for Zuzich in driving a combination vehicle (the driver's tractor, which he had leased to Zuzich, and a trailer belonging to Zuzich) would operate as follows—a trailer belonging to Zuzich would be loaded with a "contract load" of merchandise of a shipper with whom and for whom Zuzich had a contract and authority for hauling, and the employee would attach his tractor to the loaded trailer. The driver would also obtain the per-

mit card for the particular trailer, and the manifest and freight bills for the particular load. He would then drive to the designated destination of the shipment and make delivery.

March 5, 1950, Charles W. Stroud picked up a loaded trailer at the Zuzich lot at Kansas City and drove to St. Louis. Having arrived at that destination and having made delivery, he was unable to get a return "contract load." He then called at the dock of Byers in St. Louis where an agreement, a so-called "trip lease", was executed as follows,

"The Byers Transportation Co., Inc., Lessee, Agrees to pay the Lessor, Zuzich Truck Line the sum of fifty three dollars and twenty cents for the use of tractor and trailer or truck named below: (Employee's tractor-truck, and Zuzich's trailer were here named and described.)

"To be used in the transportation of freight covered by Manifest No. 5636 * * *.

"Between the cities of "St. Louis, Mo. and Kansas City, Mo.

"The Lessor is to pay all operating expenses incurred by the use of the above truck or tractor and trailer.

"The Lessor agrees to deliver the freight to final destination in not longer than ten hours and should he be delayed longer than the ten hours on this run will agree to reimburse the Lessee at the rate of $2.50 for the first hour and $1.20 per hour for each additional hour.

"The Lessor hereby acknowledges receipt of freight covered by manifest.

"$53.20 Total amount to be paid......
"53.20 Amount due.
"Byers Transportation
   Co., Inc.              Zuzich Truck Line
     (Lessee)              (Lessor)
"By Joseph Burgheimer     By C. W. Stroud"

The tractor-trailer having been loaded with Byers freight and sealed, an emergency travel order was provided Stroud by Byers; Stroud was given the freight bills and manifest covering the freight contained in the

trailer; and Stroud departed on the fateful journey.

The instant trip lease, supra, was executed in duplicate. One copy was retained by Byers at St. Louis, the other copy (the original) was given Stroud. Had Stroud completed the movement to Kansas City, the latter copy would have been delivered by him to Zuzich, who at a later time would have presented the original copy to Byers for payment. In fact Zuzich collected the total amount to be paid as stipulated in the instant trip lease ($53.20), and Zuzich paid Stroud's widow the wage (for this very trip-lease movement) as stipulated in the verbal agreement of Zuzich with Stroud for wages and the equipment rental as stipulated in the written contract of lease, supra, which had been executed by Zuzich and Stroud.

According to the testimony of Mrs. George (Louise) Zuzich, who was Zuzich's office manager and whose duties included the "hiring and firing" of truck drivers, Zuzich preferred that his drivers "deadhead back" (return empty) if, upon delivering a contract load to its proper destination, they could not obtain a "contract load" for transportation to other points or for transportation upon a return haul to Kansas City. She testified that Zuzich did not encourage drivers to "trip-lease" the equipment to a common carrier. Zuzich did not desire, but permitted his drivers to trip-lease equipment. If drivers could not obtain a contract load, they had the option to trip-lease to a common carrier or deadhead back. "We would rather they would deadhead it back." She stated she had brought this to the attention of Stroud several times, and he would "threaten to leave us if he had to lay over" and wait for a contract load. So Stroud and Zuzich's other drivers were given the option of procuring a common-carrier load. But, "We have told them that if they took these common-carrier loads, they were strictly on their own, that they were no longer under our insurance and under our employ or jurisdiction, and to be sure and get a lease and travel properly, get the placards and cover up the Zuzich signs, as they were strictly on their own from then

on and not in our employ during that particular period. Stroud understood it and so do all of the men, and he was told that when he first came there and several times during his employment." But while Mrs. Zuzich implied that Stroud had been given no express authority to execute trip leases to common carriers in Zuzich's behalf, she stated that he "had authority to bring back, or option to bring back, a (common-carrier) load if he wanted to that way." She further admitted that Stroud had authority to execute a trip lease to a common carrier "in behalf of Zuzich."

Regardless of whether a driver's return haul was a "contract load", or a "common-carrier load" or an "empty", Zuzich paid the driver his verbally stipulated wages deducting therefrom social security tax, and income tax withholdings. From an actual pecuniary standpoint it was apparently advantageous to Zuzich and to the driver (if no contract load were procurable) to trip-lease the equipment to a common carrier rather than to "deadhead" back because in a deadhead movement the driver received but seventy-five percent of his tractor rental, and, of course, Zuzich received no revenue in the deadhead movement; whereas, under a trip-lease movement, a driver got his full tractor rental pay from Zuzich, and Zuzich got the amount of the trip-lease rental from the motor carrier. However, Mrs. Zuzich testified a common-carrier load was not in fact advantageous to Zuzich, because frequently delay was entailed in waiting for and loading common-carrier freight, and common-carrier freight was sometimes injurious to Zuzich's trailers.

Witnesses for Zuzich, who were or had been drivers for Zuzich, testified of the customs and practices of the trucking industry to cover the sign on the vehicle of the regular employer, lessor, when a vehicle is trip-leased and to put other signs on the vehicle showing the name of the trip lessee; to require a physical examination of the driver; and to examine the driver's union card. The witnesses said, in effect, that so far as they knew it was a custom in the industry that a driver "always looked to the one" he was "trip-leased to" for orders for the trip.

One said that drivers are "subject to whatever rules that company wishes to make and whatever route they tell them to operate on." One of the witnesses said that in signing trip leases, he usually signed, "Zuzich Truck Line and then my name." Zuzich had told him "if we could not lease it or had no load we could bring it in empty." Another testified he had been instructed by Zuzich, "We were to pick up from the company he had the contract with, but if not we should return empty if we wished, if not, we could get a contract." One testified there was a sign posted "for a while" on the bulletin board at Zuzich's office, "If you haul for a common carrier you are under their control." He believed the sign was posted while Stroud was employed by Zuzich. This had also been "talked about" when Stroud was present. None other of these witnesses testified they had been instructed that if a movement was by trip lease the driver was not under the control of Zuzich, or that the driver was "on his own" and no longer "under" Zuzich's employ.

Witnesses for Byers, former drivers for Zuzich, testified they had never been instructed that, when under trip lease, they were "on their own" and no longer the employees of Zuzich. One of these witnesses said, "Well, all the instructions that I ever had was to load a packing house load and if we could not get a packing house load to get a common-carrier load." Another said, "George did not want me to come back empty. He said he wanted me to get a load both ways if possible."

The local manager for Byers in St. Louis testified that he saw Stroud at the Byers dock in St. Louis. He gave Stroud no instructions as to route. The certificates of authority to Byers prescribed the Byers route, and it was understood that Stroud was to go to the Byers Kansas City dock. So far as the witness knew, no one representing Byers gave Stroud any other orders or directions. The dispatcher for Byers at St. Louis testified a "trip-leased" truck would be loaded and sealed at the Byers dock. Relating to orders to drivers on trip-lease movements, the witness testified,

"Well, when they get there (at the Byers dock in St. Louis), they know they want a load to Kansas City. And if any of them come in that has never hauled for us before, they will say, 'Where do I take this?' Just Byers to Byers dock, that is all." The general manager for Byers testified the trip-lease agreement with Zuzich was for the purpose of getting the equipment of Zuzich to bring freight to Kansas City, "we had no control over who the driver would be. We could neither hire nor fire the man. * * * whatever driver they would have on that unit is the one we would have to take."

A member of the legal staff of the Public Service Commission of Missouri testified that an emergency travel order is a means by which a common carrier may obtain emergency equipment for use under the carrier's authority and which equipment the carrier does not own. The witness said that, when an emergency travel order is issued, the lessee "looks at the rights of control over that vehicle." The witness also read into evidence an interpretation of the Missouri Bus and Truck Act, 1931, by the Public Service Commission as of November 27, 1933, as follows, "In respect to leased trucks the Commission holds a leased truck must be the actual property for the time being of the lessee and the driver of such truck must be the servant in the sense that a master and servant relationship is to the lessee. Otherwise, the lease will be a mere independent contract of carrier."

Zuzich also introduced into evidence Part II of the Interstate Commerce Act, 49 U.S. C.A. § 301 et seq.; Rules 2.36 and 4.2 of the I.C.C. Motor Carrier Safety Regulations; Rules Nos. 22, 23 and 58 of the Public Service Commission of Missouri; and four motor carrier cases (Interstate Commerce Reports) relating to the full responsibility of a motor carrier for the operation of leased or interchanged equipment belonging to others but in the motor carrier's use or service, and rulings of the Interstate Commerce Commission that absent the assumption of such full responsibility by the motor carrier such a movement is unlawful. Gerard Motor Express, Inc., 2 M.C.C. 271;

Dixie Ohio Express Co., 17 M.C.C. 735; D. T. & C., Inc., 49 M.C.C. 231; Juan De La Cruz Guerra, 49 M.C.C. 657.

The parties, appellants and respondents, all cite the case of Ellegood v. Brashear Freight Lines, Inc., 236 Mo.App. 971, 162 S.W.2d 628, in which case it was held that Brashear was not liable in the action for negligence; that Brashear was a special employer of plaintiff under the borrowed servant doctrine, and that plaintiff's injury, under the shown facts, was compensable under the Workmen's Compensation Law. In the Brashear case the St. Louis Court of Appeals stated it has been generally held that an employee in the general employment of one employer may, with his consent, be loaned to another and become the employee of the person to whom he is loaned if the latter has exclusive control of his work. The Court of Appeals had examined many cases of this and other jurisdictions and stated the law to be that the relation of employer and employee exists, as between a special employer to whom an employee is loaned and the employee, whenever the following facts concur—(a) consent on the part of the employee to work for the special employer, (b) actual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract so to do, (c) power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue. See now Wittgrove v. Green Lea Dairies, Mo.App., 223 S.W.2d 114, wherein there was evidence supporting a finding that claimant had no knowledge that she was not working for her regular or general employer (when in fact she was working in the store of Murdick) but thought she was working in another unit of the chain of ice-cream stores operated by her regular employer. Under the evidence, the Commission's finding that claimant was entitled to compensation under the Workmen's Compensation Law as against her general employer, Green Lea Dairies, was upheld. Particularly on the issue of exclusive control, see McFarland v. Dixie Machinery & Equipment Co., 348 Mo. 341, 153 S.W.2d 67,

136 A.L.R. 516, wherein it was held that plaintiff could not recover in his action for negligence against Whalen's general employer, defendant. There was a shown complete severance of Whalen's employment from his (former) general employer, defendant.

In the Brashear case it was pointed out that because of the broad meaning of the term "employee" as defined in the Workmen's Compensation Law, Section 287.020, subd. 1, RSMo 1949, V.A.M.S., the term includes every person "in the service of any employer" and is not confined to those "under any contract of hire", express or implied, but also includes those performing service by "appointment or election." Pruitt v. Harker, 328 Mo. 1200, 43 S.W.2d 769. The court held that plaintiff's evidence demonstrated that an agreement had been made between Curtis, plaintiff's general employer, and Brashear whereby plaintiff and the truck belonging to Curtis were loaned to Brashear. *Consent to the arrangement was inferred from plaintiff's shown acceptance and obedience to orders given by Brashear and its operating representatives.* In the Brashear case it may be noticed that Curtis, who was the general employer of plaintiff, *did not stand in the relation of an independent contractor to Brashear.* Brashear Freight Lines, Inc., did not employ Curtis to do hauling for it. In this connection, the trip-lease agreement, in the instant case, signed by Stroud purportedly for Zuzich, obligated *Zuzich,* lessor, to deliver Byers freight to final destination, Kansas City. We also recall the testimony that Stroud had authority to execute such a trip lease, and in Zuzich's behalf.

Byers did not, so far as the evidence shows, issue any particular verbal orders as to the details of the trip-lease movement. So far as the evidence shows, it could be inferred Byers no more than indicated to Stroud the route for the haul and the destination of the freight; indeed, the freight to be hauled and the destination were stated in the trip-lease agreement. There was no evidence tending to show that Byers undertook to give Stroud detailed instructions or orders, for example, instructions or orders as to the manner or method of operating the combination vehicle, or undertook to prescribe or limit its speed. There being no orders (other than at most as to route and destination as would be necessary to enable the performance of the trip-lease agreement) shown to have been issued by Byers and hence no shown acceptance and obedience to such orders by Stroud, there were no bases for the inference that Stroud had consented to a transfer of his employment as in the Brashear case, supra.

We now again note the actual language of the trip-lease agreement in which the lessor, *Zuzich,* agreed to deliver the Byers freight to final destination. Although Zuzich's office manager testified that Zuzich did not desire his drivers to execute trip-lease agreements with motor carriers, and that a haul of common-carrier freight was not desirable because of delay which such a haul sometimes entailed and because such a haul caused wear and tear on Zuzich's equipment, yet the manager also said, as stated, that Stroud had Zuzich's authority to execute trip-lease agreements and in Zuzich's behalf. It was clearly shown that Zuzich got revenue on trip-lease hauls which he did not get on deadhead movements. And there was testimony from which it could be reasonably inferred that Zuzich not only considered common-carrier hauls desirable, but urged his drivers to make them, if no contract load were procurable. In this connection Commission was not obliged to believe the testimony that Zuzich had told his drivers, including Stroud, that, on a common-carrier haul, they were "on their own" and no longer in Zuzich's employ. Two drivers or former drivers for Zuzich so testified, in effect, but several of them testified they had been given no such instructions. We also point out that Zuzich had the exclusive right, as between Zuzich and Stroud under Paragraph 6 of his contract with Stroud, to contract for any and all freight hauled with Stroud's tractor; and to determine the class of freight and for whom, between what points, and over what routes the freight was to be hauled. In these circumstances, Commission was justified in finding that

Stroud believed he was acting for Zuzich in executing the trip-lease agreement in Zuzich's behalf, as there was evidence tending to show Stroud had authority from Zuzich to do; and that Stroud thought that, in driving the combination vehicle laden with common-carrier freight, he was acting on a special mission in the continuing service of his regular employer Zuzich, and had not consented to become and so did not become the special employee of Byers.

We do not suppose the regulations and rules and interpretation of rules of the regulatory authorities could command an employee's consent to a transfer of his status as an employee from one employer to another, although it may be that such regulations and rules might have a bearing on an issue of the right or power of a motor carrier to control or direct. We believe it should not be said such regulations were designed to change the borrowed servant rule or to affect an employee's rights to, and an employer's liability for, workmen's compensation in contravention of the facts as shown by evidence to have existed as between the parties involved. Nor do we believe the language of Paragraph 1 of the contract between Zuzich and Stroud (providing that the equipment was to be operated in accordance with the applicable rules and regulations of the various states through which the equipment was operated) should be construed to mean that Stroud by the contract agreed or consented that any future transfer of his (workmen's compensation) employment status should be effectuated by the rules and regulations of regulatory authorities. (Here, in passing, we digress to notice a principle of the law of negligence. Under this principle Byers might have been liable to another for negligence of Stroud on the trip-lease haul. This is because, regardless of any independent contractual relationship, the movement was under the Byers certificate, authority or franchise as a motor carrier. The principle has been restated as follows, "An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for bodily harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity." Restatement, Torts § 428. See also State ex rel. Algiere v. Russell, 359 Mo. 800, 223 S.W.2d 481. We do not consider this principle of the law of negligence applicable in this workmen's compensation case involving the borrowed servant doctrine.)

Neither the Commission nor we may avoid the issue of employee's consent. An employee, for compensation purposes, cannot have an employer thrust upon him against his will or without his knowledge. Important rights including the employee's right to compensation, and employers' liabilities (and of the one or the other, as here), for workmen's compensation may be affected by a transfer of his status as an employee of one to another. And it has been said that, most important of all, the employee "loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit." Vol. 1, Larson, The Law of Workmen's Compensation, § 48.10, p. 710 at pages 711–713. And, on the other hand, it would seem that one in the service of an employer may be transferred with his consent to the service of another for some special purpose, and during his employment with the other he may be a stranger to his original employer so that he may maintain an action at common law for negligence against his original employer. Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S.W.2d 119.

But there must be some consensual relationship between the loaned employee and the employer whose service he enters. Vol. 3, Schneider, Workmen's Compensation, Per.Ed., § 782, p. 14.

The judgment of the circuit court should be reversed, and the cause should be re-

manded with directions to affirm and reinstate in all respects the awards of the Industrial Commission.

It is so ordered.

LOZIER and COIL, CC., concur.

PER CURIAM: The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.