Irvin FELDMANN, Employee, Respondent,

v.

DOT DELIVERY SERVICE, Employer, and Bituminous Casualty Corporation, Insurer, Respondents,

Brueckman Cooperage Company, Employer, and National Automobile & Casualty Insurance Company, Insurer, Appellants.

No. 32852.

St. Louis Court of Appeals.

Missouri.

Feb. 20, 1968.

**492**

R. C. Reis, St. Louis, for appellants.

Gunn & Gunn, St. Louis, for respondent, Irvin Feldmann.

Albert I. Graff, Frank J. Lahey, Jr., Malcolm I. Frank, St. Louis, for respondents, Dot Delivery Service, employer, and Bituminous Casualty Corporation, insurer.

TOWNSEND, Commissioner.

This Workmen's Compensation case presents another illustration of the loaned employee problem. The Referee entered an award against the general employer and the special employer (and their respective insurers) as joint employers for healing period and for permanent partial disability of the claimant; he found that $2185 had been paid to the claimant for temporary total disability by the insurer of the general employer. Upon review the Industrial Commission found as a fact that the claimant was in the exclusive employ of the special employer at the time of his injury. The final award recites that claimant was not in the employ of the general employer at the time of injury; therefore compensation against the general employer and its insurer was denied. The recited compensation payable under the final award was for $3670 less the sum of $2185 previously paid by the insurer of the general employer.

The special employer and its insurer appealed to the Circuit Court which sustained the final award of the Commission. The special employer and its insurer appear here as appellants and the general employer as respondent.

The employer parties to this proceeding are Andrew G. Hart operating under the name of Dot Delivery Service and engaged in local drayage and trucking and Brueckman Cooperage Company, a corporation, carrying on the business of buying, selling and reconditioning used steel drums and wooden barrels. For the sake of brevity the parties will be hereafter referred to respectively as Dot and Brueckman.

In 1956, Dot and Brueckman orally entered into the present controversial arrangement involving the haulage of barrels for Brueckman. Dot bought from Brueckman a truck owned by the latter, removed the barrel body therefrom and installed it on a new truck chassis purchased by Dot. At the time of claimant's accident the name "Brueckman" still appeared on the body; elsewhere the Dot name appeared on the side of the truck. The agreement called for Dot to furnish a truck and driver to Brueckman at a fixed hourly rate. Fuel and oil and repairs were furnished by Dot. Brueckman paid for eight hours at the hourly rate in respect of any day during which the truck was in its service for any length of time, but if the truck were used at no time on a particular day there was no charge for that day. There were times when the driver at the close of a day would telephone Dot that Brueckman would not use the truck the following day; in such event the driver (present claimant) would work on his farm the following day but occasionally he would come in to Dot and make city deliveries for Dot. In the latter case he did not use the truck which otherwise he would drive on the Brueckman business. That truck was normally housed overnight at the Brueckman premises, and the driver began his day there at 8 a. m. The driver received his Dot pay check every Friday night at the Dot garage; in-

come withholding taxes and social security taxes were withheld by Dot. Vacation pay was paid to the driver by Dot. The truck which was allocated to Brueckman business by Dot was never used for any other purpose. The arrangement with Brueckman was the only one of its nature into which Dot entered. Mr. Hart testified that because of one driver's personal differences with Brueckman's superintendent Hodge he removed that driver from the Brueckman job at the insistence of Hodge and that he (Hart) then filled in on the driver's job himself as a substitute. After claimant was hired by Dot, Hart rode the job with claimant for a few days in order "to see if he could drive". When Mr. Hart was acting as a substitute, he was instructed to make stated deliveries and pick-ups and to stop by certain companies on the way in or out to see if they had any drums to pick up. While not instructed the route to follow, "he [Hodge] would tell you what accounts to go to first". In picking up barrels he was given definite instructions as to the kind of barrels to be picked up and as to a kind not to be picked up because of nails in the body of the barrels. He stated further that claimant was hired for the specific job of driving for Brueckman and that Brueckman "wanted one driver at all times because it was beneficial to them going around and learning these pick-ups and stops and what type of drums to get"—that Brueckman insisted that it have a familiar driver "That's around the job every day". When a delivery or pick-up necessitated the payment of a bridge toll, the amount of same was furnished to the driver in cash by Brueckman at the beginning of a trip. Mr. Hart testified that otherwise than as above stated he had no "control or jurisdiction of the use of that truck when it was given to Brueckman Cooperage" and no control or supervision of the driver as to what he did or "anything about his working".

Testimony of the claimant: He did the hauling at Brueckman for five years or more. The work was fairly steady; sometimes he worked five days a week and at other times only three or four days. When he went to work for Brueckman on any particular day he never received any instructions from anybody at Dot as to what he had to do. He received his orders from the superintendent of Brueckman either to make deliveries or to make pick-ups, "whichever comes first". When he entered upon his employment Mr. Hart instructed him to follow Brueckman orders in making deliveries or pick-ups,—"Whatever they told me to do. That they were to give me my orders when I went down there to pick up". As to his actual operations claimant testified:

"Q. Now, they gave you an invoice for each stop you were going to make and then you figure out this routing or this figuring yourself?

A. All truck drivers do that.

Q. Did Hodge [superintendent] ever tell you that you follow any particular route through the city or take any particular streets?

A. No.

Q. Did he do anything more than just say here are some invoices, you go out and deliver them?

A. It's more the way it went.

Q. Now, on pick-ups, were there any particular instructions about how you were to handle that?

A. Well, it was stacked the same way * * *.

Q. And that would be the extent of the instructions that you got from the Brueckman Cooperage?

A. Unless something special come up and they wanted you to do something particular.

*   *   *   *   *   *

Q. Did Brueckman ever tell you, give you any instructions whatsoever with re-

gard to how you were to drive that truck or handle the truck?

A. Why, no. They never told me what street.

\*     \*     \*     \*     \*     \*

Q. While you worked for Brueckman Cooperage at any time did anybody other than the Brueckman Cooperage people give you instructions on what to do?

A. Well, any time the truck driver is leased out to somebody, they take orders from that person. That's what you would do. If I come up to work for you, I take orders from you. If I come over, if I come over to work for him, I'd naturally have to take orders from him.

Q. And during that time you take no orders from Dot Delivery Service or anybody connected with Dot?

A. Wouldn't have any occasion to.

\*     \*     \*     \*     \*     \*

Q. They [Brueckman] had complete control and jurisdiction over what you had to do while you were putting in time for that company?

A. For that day, yes.

\*     \*     \*     \*     \*     \*

Q. Did you ever have any agreement with the Brueckman Cooperage, any— let's put it this way. Did you have any discussion with the Brueckman Cooperage about working for them directly?

A. No.

Q. There were no agreements of any kind between you and Brueckman that you were going to work for them?

A. No. You mean like on my days off or anything?

Q. No. While you were driving that truck.

A. No."

When claimant arrived at the Brueckman plant with a load of barrels at quitting time, the load was just left on the truck there and claimant would unload it the next morning.

Claimant's injury occurred on the truck while he was engaged in picking up barrels at the premises of a Brueckman customer for conveyance to the Brueckman plant.

When claimant was off sick upon one occasion, he notified Dot and Dot sent another driver to replace him. When claimant was injured in the course of operating the truck for Brueckman, he reported his accident to Dot; he never personally notified Brueckman although Brueckman knew of the accident. Brueckman never paid claimant any salary or bonus—not even a Christmas gift.

Miss Dillon, until recently President of Brueckman, described the Brueckman business as buying drums and barrels, reconditioning and selling them; in some situations Brueckman simply reconditioned drums for others at a service charge. When Brueckman received calls to make pick-ups they endeavored to route the truck in one area and the same technique was followed in connection with making deliveries. After the Brueckman truck was sold to Dot Brueckman had no delivery trucks; nor did it have its own driver who drove a truck furnished by Dot. The driver assigned to the truck by Dot was kept on the job regularly unless he became ill or there was some emergency in his family. Miss Dillon testified that instructions were given to the driver by Hodge, Brueckman's superintendent, and, in Hodge's absence, by herself. Upon most occasions customers would inform Brueckman when they had drums on hand and "how much they are". Some regular customers were called on once a week, others twice a month. On some occasions, when a call came from a new customer the driver was sent to the customer to view drums on hand with instructions to call Brueckman and report on same; thereupon Brueckman would quote a price for the drums. "If this were something routine, a customer which had been referred from

somebody else we'd tell them to make the same price we made the other customers". There was no difference in the operation of the truck after 1956 than before.

"Q. But after Feldman worked for you awhile, he then became acquainted with your customers and had the same contacts that your driver had before 1956, isn't that true?

A. I would think so.

\* \* \* \* \* \*

Q. Now you had absolute control over the operation of that truck when it was reported to you in the morning at eight o'clock for that day, didn't you? \* \* \* the Brueckman Company had.

A. Yes.

Q. And whatever direction was given as to the operation of that truck on those days the Brueckman Cooperage Company would decide it and not Dot Service?

A. That's right.

Q. In other words, Dot Service Company had no control over the truck or driver when he was in your service?

A. I don't know about the truck, but we gave the orders to the driver, if that's what you mean."

Prior to 1956, a truck driver was rarely used in the Brueckman plant. "If the driver turned in early and we had no further work for the truck, I would say we would put them in the plant but that wouldn't happen too much." However no driver furnished by Dot was ever used in the plant.

By deposition Superintendent Hodge, now Vice-President and Secretary of Brueckman, testified that either he or Miss Dillon gave the driver of the truck his orders each day. When claimant operated the truck his operations were the same as those which were performed by Brueckman's own truck drivers before the ar-

rangement was made with Dot; directions given to the claimant were the same as those given to Brueckman's own prior drivers. Hodge knew of no control or supervision exercised by Dot over the driver.

The pertinent statutory (RSMo 1959) definitions are: Employee—"every person in the service of any employer, as defined in this chapter, under any contract of hire, express or implied, oral or written, or under any appointment or election" (§ 287.020, V.A.M.S.) and Employer—"* * * every other person * * * using the service of another for pay" (§ 287.030, V.A.M.S.).

Both parties have cited to us Ellegood v. Brashear Freight Lines, Inc., 236 Mo.App. 971, 162 S.W.2d 628. In that case the facts closely parallel the situation now before us. After a review of the statute and cases the Court said:

"From the foregoing cases we find the law to be that the relation of employer and employee exists as between a special employer to whom an employee is loaned and said employee whenever the following facts concur: (a) consent on the part of the employee to work for the special employer; (b) actual entry by the employee upon the work of and for the special master pursuant to an express or implied contract so to do; (c) power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue."

It may be noted that the court does not specify the parties thereto when under (b) it refers to an express or implied contract.

■ Appellant maintains that none of the tests stated in the Ellegood case is satisfied here. First, that there was no consent to work for the special employer. This position is not tenable. The evidence clearly shows that for a period of more than five years the claimant operated the truck in the service of Brueckman, that from the beginning he reported to Brueckman regularly

in conformity with his initial instructions from Dot, that he recognized that "any time the truck driver is leased out to somebody, they take orders from that person" and in accordance with that recognition he followed the instructions of Brueckman for more than five years. "Consent * * * may be inferred from his [driver's] acceptance of and obedience to orders given by [special employer], through its operating manager and other representatives." Ellegood v. Brashear Freight Lines, Inc., supra. Furthermore, it appears from the testimony of Mr. Hart that claimant applied for the particular job of driving the truck for Brueckman and that he was hired "to drive on this particular contract" that Dot had with Brueckman. Claimant's consent is conclusively established.

■ Appellant then contends that Brueckman did not have the power to control the details of the work to be performed by claimant. We think the evidence establishes the contrary. Claimant was furnished to Brueckman by his general employer in accordance with the contract between the two and he was instructed "to follow their orders on that. Whatever he told me to do." Such instructions combined with the employee's acquiescence therein indicate Brueckman's right to control the details of claimant's work whether that control was extensively exercised or not. "It is the 'right of control' or perhaps more clearly expressed the 'right to direct' and not the exercise of that right which is the factor for consideration on the control issue." Patton v. Patton, Mo., 308 S.W.2d 739, 747. And see O'Brien v. Rindskopf, 334 Mo. 1233, 70 S.W.2d 1085, 1088: "The right of control, rather than the fact of control, governs." While claimant's activities on the job appear to have been generally routine in picking up and delivering barrels, he indicated that there were occasions when "something special come up and they [Brueckman] wanted you to do something particular". Thus, according to Miss Dillon, there were sometimes departures from the mere routine of hauling; on occasion claimant would be sent out to inspect drums which someone had for sale and to report about the same by telephone and to select those for purchase. Miss Dillon, former president of appellant, testified that Brueckman had absolute control over the operation of the truck for the day after it was reported to the company in the morning. Mr. Hodge, appellant's then superintendent, stated that whatever he wanted to do with the truck, he gave the orders to do it. Both Miss Dillon and Mr. Hodge testified that the driver operated in the same way after the agreement with Dot as Brueckman's own driver had operated previously, that the truck was routed and the driver given his orders the same after 1956 as before. Brueckman's right of control and its actual control of details is well shown by the testimony of Brueckman's own witnesses as well as by the testimony of Dot's representative that Dot had no control or supervision of the driver as to what he did or "about his working".

There is no persuasiveness about appellant's contention that claimant did not enter upon the work of the special employer. This part of the argument seems to rest upon the contention that the pick-up and delivery of barrels was not within the compass of the usual and customary business of appellant, which appellant would by its own definition confine to the repairing and reconditioning of barrels. The evidence shows that historically the pick-up and delivery were integral parts of the appellant's overall operations and that they continued to be such after the contract made with Dot. Both the purchase and the sale of barrels involved haulage in that the reconditioning and repair necessitated the presence of the barrels at Brueckman's plant and such reconditioning was a factual condition precedent to sales. Upon occasion Brueckman performed only a service to customers in repairing barrels which were not the subject of purchase and sale. Rendition of such service necessitated transport to appellant's plant and return to the customers. Such transport was a usual and customary

part of such service. We add that the general employer's payment of the expenses of the operation, his keeping the machinery in repair and his payment of the employee's wages do not militate against a finding that the employee entered upon the lessee's business or prevent the lessee from becoming a special employer. Patton v. Patton, supra, 308 S.W.2d at page 747.

■ Further, appellant would have us find that claimant was not an employee of Brueckman because there was no express or implied contract between claimant and Brueckman for claimant to work for Brueckman. Therefore, says appellant, a part of the test laid down in Ellegood v. Brashear Freight Lines, Inc. was not satisfied, namely, that part relating to actual entry by the employee upon the work of the special employer pursuant to an express or implied contract so to do. As evidentiary support for that contention appellant cites the testimony of claimant that he never had any discussion with Brueckman about working for them directly—that there were no agreements with Brueckman that he was going to work for them.*

It is obvious that there was no contract, express or implied, between claimant and Brueckman. Contract is promise or promises and the testimony affords no basis for finding that, as between claimant and Brueckman, there was any promise by or to either. However we find that the existence of a contract with the loaned employee is not a prerequisite to the investiture of the lessee with the new rank of special employer.

What the argument of appellant does in this connection is to seize upon the partial summary in Ellegood v. Brashear Freight Lines, supra, take it out of context and ignore the specific detailed holdings found in other parts of the opinion. Thus, the opinion, after referring to the statutory definition of employee, states that "There was no contract of service, express or implied, between the plaintiff [loaned driver] and Brashear Truck Lines, Inc., [lessee], the only contract of service shown by the evidence being between plaintiff and Curtis, his general employer. But, the statutory definition goes further. It says that one may be an employee if he is in the service of another 'under any appointment or election'". The court then quotes from Pruitt v. Harker, 328 Mo. 1200, 43 S.W.2d 769, 772-773 "The term 'employee' is thus given a broad meaning and includes every person 'in the service of any employer' and is not confined to those 'under any contract of hire,' express or implied, but also includes those performing service by 'appointment or election' ". The court in the Ellegood case held that the loaned driver was an employee of the lessee (special employer) under the compensation act. Thus, it is clear that appellant has misconstrued the actual ruling in that case. In the case at bar it is equally clear that Dot, in accordance with its contract with Brueckman, appoint-

---

* Appellant takes one additional step and maintains that the absence of an agreement between claimant and the special employer shows that there was no consent to the *substitution* of the latter for the general employer. Appellant's language suggests that something in the nature of a novation would be necessary in order to find that claimant was an employee of the special employer. In this connection appellant's contention is wholly unacceptable. When a special employer is brought into the picture the process involves *not a substitution* of one em-

ployer for another but the *addition* of an employer. The pre-existing relationship of general employer and employee is not extinguished by reason of the fact that a third party may become a special employer under the terms of the Compensation Act. The original employer remains responsible for performance of the contract which he made with the employee; one need only cite, for example, the obligation to pay contracted wages and the honoring of a provision for duration of employment if there be such a term.

ed claimant to perform services for Brueckman and that claimant actually entered upon the work of Brueckman and for a period of more than five years performed such services for Brueckman with full knowledge and acquiescence. He was injured while in the service of Brueckman.

Appellant has urged that this court should follow Schepp v. Mid City Trucking Co., Mo.App., 291 S.W.2d 633. We believe that that case has been sufficiently distinguished from the situation here presented by the Supreme Court in Patton v. Patton, supra, and Wright v. Habco, Inc., Mo., 419 S.W.2d 34. This court is not unaware that in the Ellegood case and in Habco case the action was one for damages. However in each the vital issue was whether the plaintiff was an employee of the defendant by definition of the Workmen's Compensation Act and, if so, limited under the act to the remedies given by that act.

Finally appellant contends that Dot was an independent contractor at the time Mr. Hart drove the truck as a temporary "filler-in" and that the nature of his contract with Brueckman did not change when he assigned his employee Feldmann to the job. Without attempting to determine what Mr. Hart's rights would have been if he had been injured while driving the truck on Brueckman business, we reach the definite conclusion that Dot was not an independent contractor. Brueckman sub-contracted no part of its business to Dot and Dot did not contract to accomplish a particular result. By the contract Brueckman merely procured from Dot additional facilities with which to perform Brueckman's business. Ellegood v. Brashear Freight Lines, Inc., supra, 162 S.W.2d at page 631. And see Wright v. Habco, Inc., supra, 419 S.W.2d at page 38.

Finding that Brueckman was a special employer of claimant and that claimant's injury arose out of and in the course of his employment by Brueckman, the judgment is affirmed.

PER CURIAM:

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, judgment is affirmed.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.

