**Herbert BROWN, Respondent,**

v.

**MISSOURI LUMBER TRANSPORTS, INC.,** Employer, and Hartford Accident & Indemnity Company, Insurer, Appellants.

**No. 54933.**

Supreme Court of Missouri, Division No. 1.

July 13, 1970.

---

Herder & Kearns, By: Arthur E. Herder, Jr., St. Louis, for respondent.

Edmund J. Barker, and Albert E. Cunliff, St. Louis, for appellants.

HIGGINS, Commissioner.

Appeal by employer and insurer from judgment affirming award of the Industrial Commission of Missouri to claimant of $12,463.20 medical aid and $12,750 (300 weeks at $42.50 per week), plus $27.50 per week for life, compensation for permanent total disability, an award in excess of $25,213.20. Appellants stipulated respondent's injuries, his permanent total disability, and the amount of the award, but seek to be relieved from the award, contending that claimant was not the employee of his general employer, Missouri Lumber Transports, at the time of his injury but was the employee of a special employer, Steel Haulers, Inc., as a loaned employee.

It probably is unnecessary to state the rules governing review of an award of the Industrial Commission, but the parties have briefed the matter extensively and, accordingly, another statement of such principles will be made. The award is not to be set aside upon review if the commission could reasonably have made its findings and reached its result on the evidence before it because the court's duty in reviewing a compensation case is to determine whether the commission's award is supported by competent and substantial evidence upon the whole record. The reviewing court may not substitute its own judgment on the evidence for that of the commission. The reviewing court is authorized to decide whether the commission could reasonably have made its findings and reached its result upon consideration of all the evidence before it; and it is authorized to set aside decisions only when clearly contrary to the overwhelming weight of the evidence. The court reviews the record in the light most favorable to the findings of the commission; weight of the evidence and credibility of the witnesses are for the commission; and where evidence and inferences are conflicting, resolution rests with the commission and it is conclusive on the reviewing court. Art. V, § 22, Mo.Const.1945; § 287.490, V.A.M.S., and see Stephens v. Crane Trucking, Inc., Mo., 446 S.W.2d 772, 774; Dupree v. Yorkshire Cleaners, Mo.App., April 28, 1970, 454 S.W.2d 607; Merriman v. Ben Gutman Truck Service, Inc., Mo., 392 S.W.2d 292;

Baker v. Krey Packing Co., Mo.App., 398 S.W.2d 185, 187; Baer v. City of Brookfield, Mo.App., 366 S.W.2d 469; Troyer v. Armour & Co., Mo.App., 423 S.W.2d 58, 61 [1]; Wilhite v. Hurd, Mo., 411 S.W.2d 72, 77 [2]; Hugelman v. Beltone, Mo.App., 389 S.W.2d 220, 223 [3]; Pratt v. Reed & Brown Hauling Co., Mo.App., 361 S.W.2d 57, 61–62 [1–4]; Liverman v. Wagner, Mo.App., 384 S.W.2d 107, 109 [2, 3]; Miller v. Sleight & Hellmuth Ink Co., Mo., 436 S.W.2d 625, 628 [6]; Offutt v. Travelers Ins. Co., Mo.App., 437 S.W.2d 127, 129; Dickhaut v. Bilyeu Refrigerated Transport Corp., Mo., 441 S.W.2d 54, 56 [1]; Stroud v. Zuzich, Mo., 271 S.W.2d 549; Shrock v. Wolfe Auto Sales, Inc., Mo., 358 S.W.2d 812; Pulliam v. Home Bldg. Contractors, Inc., Mo.App., 363 S.W.2d 48, 50 [2].

It was admitted that Herbert Brown had an accident March 5, 1965, and that at that time Missouri Lumber Transports, Inc., was an employer subject to the Missouri Workmen's Compensation Law and insured by Hartford Accident & Indemnity Company; and appellants' reply brief states "there is no question but that Herbert Brown remained in the general employment of Missouri Lumber Transports, Inc."

In January, 1965, Herbert Brown met with Robert Russell, President, Missouri Lumber Transports, Inc., and he was hired as a truck driver. He was paid by the number of miles driven, 60 cents per mile for deadhead, 70 cents per mile up to forty thousand pounds, and 80 cents per mile over forty thousand pounds. Mr. Russell gave all the instructions, where to secure loads, where to deliver, and with respect to return loads or returning empty. Mr. Russell furnished the tractor and trailer and Mr. Brown was the only driver to operate it. The tractor bore Missouri's markings and identification; the company provided all licenses and permits. Mr. Brown had the duty to see that his equipment was maintained at the garages where Missouri had accounts. Mr. Brown's employment was full time for which he was paid weekly by Missouri. When on a trip Mr. Brown would call Mr. Russell's office every morning. If he hauled into the Chicago area he was instructed by Mr. Russell to report to a Mr. Parker at Steel Haulers, Inc., in Hammond, Indiana, "and he would see about getting me a load back." Mr. Parker was working for Mr. Russell in this respect. A special telephone was maintained by Missouri Transports in Ironton, Missouri, for communication with Steel Haulers in Hammond, Indiana, with respect to return loads. The only instruction Mr. Brown would receive from Mr. Parker pertained to where the return load could be secured. Mr. Brown received no salary or benefits from anyone other than Missouri. He consented to take orders from Mr. Russell and he was never given orders by any other person.

On four or five trips prior to March 5, 1965, Mr. Brown hauled cargo into Chicago and, following Mr. Russell's instructions, would report to Mr. Parker who told him where to get the return load and furnished the bill of lading and trip lease of Missouri's rig to Steel Haulers. Mr. Brown would supervise loading for the return trip and, upon completion of the trip, would mail his trip report to Mr. Russell. Mr. Russell gave Mr. Brown the discretion to select his return routes.

Around February 25 or 26, 1965, Mr. Brown, pursuant to instructions from Mr. Russell, delivered a load to U. S. Steel in Chicago. After delivery, he went to Steel Haulers but they had no load. While awaiting a load, he contracted the flu and called Mr. Russell, who authorized him to leave his rig and return to St. Louis. Seven days later, upon his recovery, he called Mr. Russell, who directed him to return to Chicago with another Missouri driver. The following day, March 4, 1965, he got a return load from Steel Haulers. Pursuant to his general authority from Mr. Russell, Mr. Brown executed a trip lease of his Missouri rig to Steel Haulers on behalf of, and for the benefit of, Missouri, and Mr. Parker executed for Steel Haulers. Mr. Brown drew an expense advance from Mr.

Parker and Steel Hauler's identification was placed over the Missouri identification on the door of the tractor. The return load was 43,700 pounds of sheet steel to be delivered at Aurora, Missouri. Mr. Brown supervised the loading and selected his route, Highway 66 through St. Louis and Springfield, Missouri. The accident occurred during a snowstorm in the early hours of March 5, 1965, about 60 miles south of St. Louis. He was injured and was hospitalized. While in the hospital, Mr. Brown was told by Mr. Russell "not to worry about anything that he was completely covered by insurance * * *." Mr. Brown was aware that as a driver in interstate commerce he was subject to I.C.C. regulations regarding safety of himself and his equipment. He knew that Missouri could not haul steel without the trip-lease arrangement.

Robert G. Russell, President and Managing Officer of Missouri, hired Mr. Brown in January, 1965. He was Mr. Brown's supervisor and gave general orders and instructions, and designated all loads for Mr. Brown to transport. If a Missouri driver went to Chicago, "we would advise him to go to Steel Haulers and they in turn would dispatch him out on a return load * * *. It was Mr. Parker that worked for Steel Haulers, we also compensated his wages * * *. Our instructions (to Mr. Brown) were to go to Steel Haulers and wait for a load unless we would tell them to come out empty." Missouri's drivers were to go to Steel Haulers and contact Mr. Parker who became an employee of Missouri in January, 1965. "His duties were in the event our trucks got to Steel Haulers and they would not have a load he was to use our telephone and call other truck lines and try to secure other loads back for our trucks." Missouri got the benefit of any load secured by Mr. Parker. "* * * we would invoice the carrier for whom the service was performed and we in turn would pay the driver." The load being carried by Mr. Brown at the time of his accident was secured under the arrange-

ment between Mr. Parker at Steel Haulers and Mr. Brown's employer, Missouri. Missouri's drivers were instructed to inspect Missouri's equipment daily pursuant to I.C.C. regulation. Mr. Russell acknowledged his visits to Mr. Brown while in the hospital and "explained he had nothing to worry about." Missouri's I.C.C. authority was limited to hauling lumber and Missouri trip leased its equipment for return hauls to help compensate for the expenses of it. Trip leasing is authorized under I.C.C. regulations and the lessee becomes the party responsible to the I.C.C. The agreement between Steel Haulers and Missouri provided that "Second Party (Missouri) shall hire his own drivers and helpers on the vehicles leased * * *," and Mr. Brown was hired as a driver by Missouri in accordance with that provision. Mr. Russell felt he had authority to terminate one of his drivers even if he were driving under a lease, and that he had fired drivers during a trip. He claimed a general right to fire employees, a right he felt he had with respect to Mr. Brown. Mr. Russell gave a written statement June 18, 1965, in which he stated that "Missouri Lumber Transports, Inc., had complete control and direction of the driver and the vehicle in its operation as a motor common carrier. * * * in its routine operation of its motor vehicles, it was required for the drivers, upon completion of delivery in the Chicago area, to contact Steel Haulers, Inc., and take dispatch from their Hammond, Indiana office and lease the vehicle to Steel Haulers, Inc., for a return trip and to their immediate origin territory. This procedure is given on an entirely sound basis to prevent returning empty. * * * Missouri Lumber Transports, Inc., was, and is, paying premiums on gross receipt for insurance coverage and all expenses, regardless of whether it is a basic haul or return haul to a lease under another carrier, there is not a hold harmless issue, etc., from our insurance company on Missouri Lumber Transports, Inc. * * * upon completion of delivery for Steel Haulers, Inc., the

driver would then contact Missouri Lumber Transports, Inc., for further instructions."

Joseph P. Werthmann, a district supervisor of the I.C.C., identified a number of I.C.C. regulations pertaining to safety and leasing and interchange of motor vehicles between common carriers. He acknowledged that the regulations permitted a carrier licensed only for hauling lumber to haul steel under a trip lease in which case the I.C.C. would look to the lessee with respect to any violation of I.C.C. regulations. He knew of no I.C.C. violation by Missouri.

It was stipulated that the special dual employment of W. Reed Parker by Missouri was with the knowledge and consent of his general employer, Steel Haulers, and that he furnished Steel Haulers' markings to Mr. Brown when his tractor was leased to Steel Haulers.

■ This statement of the evidence is, perhaps, unduly long and detailed. It has been so made, however, because it demonstrates, within the previously recognized rules of law, the necessary support for and propriety of the findings of the Industrial Commission upon which claimant's award stands:

"1). That Missouri Lumber was the regular employer of claimant;

"2). That Missouri Lumber was an interstate hauler for hire;

"3). That Missouri Lumber, absent the particular trip lease agreement in question had no authority to haul steel interstate;

"4). That by virtue of the trip lease in question, Missouri Lumber had the authority to make the haul of steel for Steel Haulers;

"5). That interstate hauls under another's authority pursuant to trip lease agreements such as the one with which we are here concerned, were customary and an accepted and authorized practice of Missouri Lumber's business activities;

"6). That claimant was fully authorized to execute the trip lease with Steel Haulers on the 4th day of March 1965, for and on behalf of his employer, Missouri Lumber;

"7). That said trip lease obligated Missouri Lumber to deliver the subject load of steel for Steel Haulers to its destination in Aurora, Missouri; and,

"8). That claimant in proceeding in the haul pursuant to the trip lease agreement with Steel Haulers whereon he suffered the accident and the resultant injuries complained of, was acting on a mission in the continuing service of his employer, Missouri Lumber, in its usual and customary business activities and had not consented to become and did not become the special employee of Steel Haulers."

Stroud v. Zuzich, supra, presented the same question, i. e., whether driver Stroud was the employee of Zuzich at the time of his accident or whether he became the special employee of Byers Transportation Company under the borrowed servant doctrine as enunciated in Ellegood v. Brashear Freight Lines, 236 Mo.App. 971, 162 S.W.2d 628. In virtually identical circumstances, Stroud v. Zuzich, supra, 271 S.W.2d 549 l. c. 556, held that the employee "was acting on a special mission in the continuing service of his regular employer Zuzich, and had not consented to become and so did not become the special employee of Byers." That case stands as authority in support of the Industrial Commission in its award to Herbert Brown as a brief statement of it will demonstrate. Stroud was the general employee of Zuzich, a contract hauler. He delivered a load on behalf of Zuzich and, upon failing to secure a return contract haul, trip leased his equipment to Byers, a common carrier, for a return trip, upon which he suffered his accident. The evidence showed that Zuzich had instructed Stroud to obtain the trip lease with Byers, a benefit to Zuzich, rather than to return empty. There were conflicts in the testimony on instructions and benefit, properly resolved by the commission. Byers' in-

structions to Stroud went only to designating load and destination; Byers did not control who the driver was to be; Byers did not hire or fire; Stroud had authority to execute trip leases on behalf of Zuzich.

Evans v. Farmers Mut. Hail Ins. Co., 240 Mo.App. 748, 217 S.W.2d 705, also presented circumstances and criteria in support of the commission's award to Mr. Brown. Farmers Mutual, a Missouri company, agreed to furnish Evans, its adjuster employee, to an Iowa company during an overload of the Iowa company. Evans was injured while adjusting Iowa losses for the Iowa company. The court affirmed findings of the Industrial Commission that Evans remained the employee of the Missouri company and that the loaned servant rule of Ellegood v. Brashear, supra, did not apply. "In determining the status of one as a loaned servant, in order to enable the original employer to escape liability, * * * the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person. * * * 'to escape liability the original master must surrender full control of the servant in the performance of said work.' " 217 S.W.2d l. c. 709[6,7].

Similarly, in Hargis v. United Transports, Mo.App., 274 S.W.2d 339, where driver Hargis was sent with a truck by his general employer, United, to haul automobiles for carrier, Auto Transports, Inc., and the carrier simply gave driver destination and route without specific directions in manner of operation of the truck, the employee remained in his general employment and did not become the borrowed employee of the carrier.

And, in Schepp v. Mid City Trucking Co., Mo.App., 291 S.W.2d 633, the driver employee of Mid City was injured while driving his employer's truck under lease to Pacific Intermountain Express for a day. Mid City furnished the tractor and driver, paid expenses of driver and rig, and PIE gave no instructions other than load and destination. The court held that the "control" surrendered to PIE by Mid City and exercised by PIE did not meet the quantum of control in the lessee necessary to invocation of the borrowed servant rule.

In their contention that claimant was the special employee of Steel Haulers, appellants rely primarily on Patton v. Patton & Boyd, Mo., 308 S.W.2d 739. Jess Patton drove a tractor and trailer rig for a partnership known as Patton & Boyd, and, at the time of his death by asphyxiation in a tourist cabin on his route, his rig was under lease to Tri-State Warehousing and Distributing Company and he was hauling a load of explosives for Tri-State. Patton & Boyd was a private interstate freight carrier and Tri-State was a long-haul common carrier with substantial business devoted to transporting explosives, for which it had the necessary I.C.C. authority. At the time of Jess Patton's death, Tri-State was engaged in transporting explosives for the United States government with some 70 drivers and 100 units involved, of which Tri-State had but nine or ten drivers operating its own rigs. Other drivers and units were obtained through leases such as that between Tri-State and Patton & Boyd. The lease in effect under which Jess Patton was driving was for one year and was exclusive in the service of Tri-State which contracted for deadhead as well as loaded miles. Lessors to Tri-State could not interfere with the regulations or instructions of Tri-State, their only relief being to terminate the lease. Tri-State designated Patton's route in detail, including rest stops and the stop where he died. Tri-State also arranged parking places and guards at all stops. The lease provided that "the leased equipment under this agreement is in the exclusive possession, control, and use of the * * * Lessee." The lease also provided that operators of leased equipment had to be approved by Tri-State and Jess Patton was an approved operator. All drivers of leased equipment were subject to Tri-State's supervision while hauling explosives and Tri-State reserved the right to

check all drivers and could refuse them if it wished. Under such circumstances, it was held that the commission properly found that the right to control Jess Patton while driving for Tri-State had been surrendered by the general employer within the borrowed servant doctrine of Ellegood v. Brashear Freight Lines, supra.

This statement of Patton v. Patton & Boyd shows several factors which distinguish it from Stroud v. Zuzich, supra, and the general employee-employer relationship between Herbert Brown and Missouri Lumber Transports: The lease from Patton & Boyd was express in providing that the leased equipment was under the exclusive control of the lessee; Tri-State reserved a right to approve operators of leased equipment; Tri-State's lease was not a trip lease but was for a year term and for hauling specific cargo for the United States government; Tri-State designated routes, parking, and rest areas, and guards as well as cargo and destination; Tri-State reserved the right of supervision of drivers of leased equipment; lessors simply leased the equipment and provided drivers without reservation of authority to interfere with Tri-State's regulations and instructions; the employee was shown to have consented to serve and obey Tri-State.

Appellants rely also on Dickhaut v. Bilyeu Refrigerated Transport Corp., supra, which also may be distinguished from the relation between Mr. Brown and his employer. Dickhaut's employer, Richardson, leased the equipment Dickhaut was operating to Bilyeu and, when under lease to Bilyeu, "he is under Bilyeu's control, the dispatcher's control, and he could tell him anything, and anything that he told him, that is what he was supposed to do." In addition, the lease between Richardson and Bilyeu placed "exclusive possession, control, and use" of the leased equipment in the lessee, and provided that "drivers * * * of Lessor used in connection with this agreement will be under the full control, direction and supervision of Lessee." 441 S.W.2d l. c. 54. These factors are absent

from the employer-employee relation continuing between Missouri as general employer and Mr. Brown, their general employee, and the Industrial Commission there properly found that Dickhaut was the special employee of Bilyeu within the loaned servant doctrine. Similarly, in Feldman v. Dot Delivery Service, Mo.App., 425 S.W.2d 491, the commission properly found the claimant to be the employee of special employer, Brueckman Cooperage Company, because it was shown that Dot, the general employer, "in accordance with its contract with Brueckman, appointed claimant to perform services for Brueckman and that claimant actually entered upon the work of Brueckman and for a period of more than five years performed such services for Brueckman with full knowledge and acquiescence," the claimant applied for the particular job of driving for Brueckman and was hired by Dot for the purpose. Claimant's consent to the special employment was "conclusively established." 425 S.W.2d l. c. 496 [1].

■ Appellants contend that consent of Mr. Brown to become the special employee of special employer Steel Haulers may be inferred from the evidence. It is true that such consent can be inferred from the circumstances of a case, Ellegood v. Brashear Freight Lines, supra, Patton v. Patton & Boyd, supra, Feldman v. Dot Delivery Service, supra, Wright v. Habco, Inc., Mo., 419 S.W.2d 34, but the evidence in this case is not conclusive in favor of such inference. Appellants emphasize that Mr. Brown had driven loads from Steel Haulers on previous occasions and that he knew of the lease agreement and the provisions which required him to abide by I.C.C. regulations as they might affect Steel Haulers. However, the evidence shows also that Mr. Brown acted at all times on behalf of his general employer and took direction, control, and instructions only from the general employer, factors which support findings that Mr. Brown remained in the continuing employment of Missouri and that he did not con-

sent to become the special employee of Steel Haulers. The record is void of any express consent, and with the record in this condition it may not be said that the commission could not have reached the result that it reached on this question. Whether it could have made a different finding on the same evidence is immaterial because the reviewer cannot substitute an opinion for the supported finding of the commission. Dickhaut v. Bilyeu, supra, 441 S.W. 2d 54 1. c. 58[3]. In support of the commission's position with respect to the lack of consent to special employment, see also Evans v. Farmers Mutual, supra; Schepp v. Mid City, supra, 291 S.W.2d 633 1. c. 642 [6]: "There is no express consent * * *. If it is present, it must be implied. The facts and circumstances and acts and conduct of all the parties must show a deliberate and informed consent by the claimant to the substitution of a new temporary employer. * * * The consent must be voluntary"; Wittgrove v. Green Lea Dairies, Mo.App., 223 S.W.2d 114.

■ Appellants contend finally that the lease between Missouri and Steel Haulers by virtue of its recognition of I.C.C. regulations was conclusive on the right of control in the special employer, thus making Mr. Brown a special employee as a matter of law. Appellants again cite Patton v. Patton & Boyd, supra, which already has been distinguished. It may be said further that the subjection of the equipment and operator to I.C.C. regulations binding on the special employer is but a single factor bearing on the issue of control; and under the circumstances of this case, control and direction of Mr. Brown were shown to have remained in his general employer. That either or both the carriers in their lease provisions may have violated I.C.C. regulations[1] is not the concern of Mr. Brown. His status is to be determined by the evidence of who controlled and instruct-

ed him and whether he consented to special employment.

In the posture of this record Stroud v. Zuzich, supra, 271 S.W.2d 1. c. 556, where a similar argument was made, is again conclusive:

"We do not suppose the regulations and rules and interpretation of rules of the regulatory authorities could command an employee's consent to a transfer of his status as an employee from one employer to another, although it may be that such regulations and rules might have a bearing on an issue of the right or power of a motor carrier to control or direct. We believe it should not be said such regulations were designated to change the borrowed servant rule or to affect an employee's rights to, and an employer's liability for, workmen's compensation in contravention of the facts as shown by evidence to have existed as between the parties involved. Nor do we believe * * * the contract between Zuzich and Stroud (providing that the equipment was to be operated in accordance with the applicable rules and regulations of the various states through which the equipment was operated) should be construed to mean that Stroud by the contract agreed or consented that any future transfer of his (workmen's compensation) employment status should be effectuated by the rules and regulations of regulatory authorities."

Judgment affirmed.

HOUSER, C., concurs.

WELBORN, C., not sitting.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur and ROGERS, Special Judge, concurs.

1. Mr. Werthmann of the I.C.C. knew of no I.C.C. violations on the part of Missouri.