STATE OF MISSOURI AT THE RELATION OF LONG-HALL LAUNDRY & DRY CLEANING COMPANY, and EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY, Relators, v. EWING C. BLAND, NICK T. CAVE and SAMUEL A. DEW, Judges of the Kansas City Court of Appeals.—No. 39465.—188 S. W. (2d) 838.

Court en Banc, July 2, 1945.

*Leo T. Schwartz* for relators; *Thomas E. Hudson* of counsel.

98

*John M. Langsdale* and *Clyde Taylor* for respondents.

HYDE, J.—Certiorari to Kansas City Court of Appeals to quash its opinion in Green v. Shamrod, 185 S. W. (2d) 41. Writ was

issued prior to the effective date of the 1945 Constitution and the case is briefed on the issue of conflict only. Therefore, we will decide it on that issue.

The facts are fully stated in the opinion of the Court of Appeals to which reference is made therefor. (Direct quotations from this statement are set out in quotation marks.) It appears therefrom that Joe Green (for whose death compensation is sought from relator) was an employee of John F. Shamrod, an expert boiler maker, who was making (for relator) certain alterations and repairs on a water tank as an independent contractor. It also appears "that the Laundry Company had been engaged in the laundry and dry-cleaning business in Kansas City for a number of years prior to the occurrence of the accident giving rise to the death of claimant's husband; that it owns the building and the equipment used in its business, which business is a large one; that it uses water furnished by a well and from the city water mains. This was hard water, and it was necessary, before the water could be used by the Laundry Company, in its laundering operations, that it be softened. The Laundry Company had for a number of years (at least 14) two water softeners, which consisted of two large steel tanks with water softening chemicals therein. The hard water was run through the softeners and thence conveyed by means of a pipe to a storage tank. In order to increase its water softening capacity the Laundry Company was installing an additional tank upon which deceased was working at the time he met his death. At that time the Laundry Company had procured the additional tank, (second-hand) referred to in the evidence as a boiler, circular in shape, having dimensions of about 8x10 feet and having steel walls about 3/8 of an inch in thickness."

"This tank had a manhole in its side and the Laundry Company employed Shamrod, an expert boiler maker, to move the manhole to the top of the tank and to install a steel plate over the hole left by the opening in the side of the tank caused by the removal. This work was completed by Shamrod about two or three weeks prior to the time that deceased was killed." Thereafter, the relator's employees installed the tank, "erecting it on a concrete foundation next to the two other water softeners, connecting the tank to the city water by means of a pipe, filling the tank with water, testing it for leaks, stopping leaks, if found, placing the water softening chemical in the tank, connecting the tank to the sewer by means of a drain pipe and connecting a pipe running from the tank to the storage tank." Before the connection with the storage tank was made, relator's employees turned the city water into the tank to test it for leaks. They discovered "water was leaking and seeping from several places in the tank, including the manhole at the top and around the plate that had been welded on to the side of the tank." Relator called Shamrod to check the leaks and repair the tank by caulking. This additional

work was not part of his original contract but was new and independent work.

"Shamrod sent his employee, the deceased, with a helper, to the Laundry plant to see what the job consisted of and what tools were needed. After obtaining this information these two finished another job and the helper went to Shamrod's shop and procured caulking tools, a hammer and a few pipe wrenches, and met deceased at the Laundry. The city water was turned on after they arrived at the plant of the Laundry Company and, when they examined the tank, they found that water was squirting from a gasket connected with the manhole on the top of the tank and deceased tightened the gasket, which stopped the flow at that point. At the time of his death deceased was standing on a ladder in front of the plate, which had been welded to the side of the tank, with a chisel and a hammer in his hand. He took his chisel and began to scrape the paint away from a seam near to where a leak was occurring and, while doing so, the tank "busted at the welded place with great force." The witnesses referred to it as an explosion. The bursting of the tank resulted in deceased being thrown a considerable distance to his death."

The Court of Appeals ruled on these and other facts stated in its opinion that Green was a statutory employee of relator under Sec. 3698(a) (R. S. 1939) Mo. Stat. Ann.; and further ruled that he was not within the exception of Sec. 3698(c) (R. S. 1939) Mo. Stat. Ann. This latter section provides: "The provisions of this section shall not apply to the owner of premises upon which improvements are being erected, demolished, altered or repaired by an independent contractor but such independent contractor shall be deemed to be the employer of the employees of his subcontractors and their subcontractors when employed on or about the premises where the principal contractor is doing work."

 The Court of Appeals construed the term "improvements" as used in this section to mean "improvements to realty." The Court then ruled: "The facts in connection with this point show that the tank rested on a concrete implacement but it was not attached or intended to be attached thereto. While it was, or was to be connected by pipes with the city water main and sewerage system and the storage tank, it may be inferred from all of the evidence that, even after being so connected, it could be severed without injury to the realty, just as the other equipment, such as washing machines, etc., and that it was not a piece of equipment or machinery designed to be adapted to the realty as distinguished from the business done and carried on. . . . The evidence goes no further than to show that the Laundry Company owned the building, whether it erected the building, is not shown. Neither is it shown that the building was erected for the purpose of a laundry. Nor is it conclusively shown that it is permanently adapted or devoted to laundry purposes. For

all the evidence shows the building might well, or better, be used for other commercial purposes, and the tanks were merely installed for use in the business, for which the building happened, at the time, to be used. Under such circumstances, we are of the opinion that the installation of the tank and the work being done was not the erection of an improvement to the realty, within the meaning of the act.''

The Court of Appeals said that the rule to be applied was that stated in determining whether or not any particular installation became a part of or was an improvement to realty was that stated in 36 C. J. S. 916, Sec. 11 as follows: ''Machinery or apparatus in buildings. The test of the character of the article annexed, as related to the use to which the realty is devoted, has been applied in connection with machinery or apparatus in a building, it often being said or held that when a building is erected for, or permanently adapted or devoted to, a particular purpose, anything annexed to the building for the carrying out of that purpose may be considered as accessory to the realty itself, *while such articles annexed merely for the purpose for which the building happens at the time to be used are not to be so regarded.*''

However, the italicised clause, relied upon must refer to only a temporary use of such building because the paragraph continues thus: ''It has sometimes been said that the chief test in the determination is whether the machinery is permanent and essential to the purpose for which the building is occupied or employed. In this test no distinction is made between machinery placed in a factory erected for a specific manufacturing purpose and like machinery placed in a building constructed for an entirely different purpose, but thereafter converted to a use for which the machinery is essential.''

We think this is the rule established by this court in such cases as Progress Press Brick & Machine Co. v. Gratiot Brick & Quarry Co., 151 Mo. 501, 52 S. W. 401; and Thomas v. Davis, 76 Mo. 72. [See also Havens v. Germania Fire Ins. Co., 123 Mo. 403, 27 S. W. 718; Rogers v. Crow, 40 Mo. 91.] In the Press Brick Company case, this Court held an instruction erroneous ▇▇▇ which was on the theory that a press brick machine did not become realty because it was placed in an old, existing, frame building, not erected by defendant, and that this ''machine was not used in the erection of said building, nor contemplated in the erection thereof'', but that the building was merely used to house the machine. However, the machine was set on a stone foundation and connected by steam pipes, belting and shafting, with the rest of the machinery of the plant. This Court said: ''The intention of the owner is the first and best criterion, and the adaptability of the machinery to the uses and purposes to be subserved is the next best test, in determining all cases of this character. . . . Machinery put in a manufacturing plant that is plainly (or proved to be) suitable for the transaction of the business to be carried on

in the house, entitles the person furnishing it to be a lien (because it becomes part of the realty) and it is wholly immaterial what the relative value of the house and the machinery may be, or whether they can be separated easily or not. . . . It is too plain to admit of debate . . . that the intention of the owner was to construct and erect a dry press brick plant, and that the several parts and the machinery were all necessary to form one complete manufacturing establishment, which would not subserve the purposes intended if any one of the parts was omitted, and that the whole was manifestly adapted to those uses and purposes. The machinery, therefore, became a part of the realty . . ."

This Court also pointed out therein that in Thomas v. Davis, supra, the machinery was more valuable than the frame building in which it was placed; and that the true criterion is not "the character of the fastening"; but that "more depends upon the nature of the article and its use as connected with the use of the freehold." In both of these cases, it is apparent that the building in which the apparatus was placed could have been adapted to other uses but it was held that this was not controlling. (The Thomas case also held that neither was the fact that the boiler, and other apparatus therein, could be removed without material injury to itself or the realty.) Of course, the rule of fixtures is different in cases of machinery put into a building by a tenant with an agreement for removal (such as Richardson v. Koch, 81 Mo. 264) because the original intention is different. The rule applicable here is the rule applicable to improvements made by the owner. It will be noted that Sec. 3698(c) applies only to owners. While the Court of Appeals said the evidence does not show that the building herein was erected by relator or erected for the purpose of a laundry or that it might not be adapted to other commercial purposes (immaterial under the Press Brick Company case when it was being used for a laundry on an intended permanent basis), nevertheless it was shown that it had been used as a laundry with an extensive business for more than 14 years (a longer period of use than that in the Press Brick Company case) and there is not only nothing to indicate an intention of relator to cease the operation of its laundry business, but on the contrary, it appears that the very purpose of this installation was to increase the capacity of its laundry. Of course the term "permanent" as used in the cases cited does not mean "impossible to change" but only that temporary use is not intended. The facts herein do conclusively negative the idea of a temporary use. The Court of Appeals, in fact, found that "the water softeners were but one apparatus of many in use or to be used, such as boilers, heaters, mangles, ironers, etc., the proper operation of which was essential" to the operation of relator's business; and that, because of their necessity to the operation of relator's laundry, their installation and repair was a part of its usual business (so as to make Sec. 3698(a) applicable)

and not merely incidental thereto. It is, therefore, our view that the permanent nature of this use sufficiently appears to establish (under our above discussed decisions) the character of this installation as an improvement to realty so as to bring the work on it within the exception of Section 3698(c).

■ While this ruling disposes of the case on certiorari as applied under our former practice, nevertheless, since our 1945 Constitution authorizes a ruling on the merits in cases coming to this court by certiorari (Sec. 10, Art. 5, 1945 Const.), we deem it advisable to state our construction of Section 3698(a) (R. S. 1939) Mo. Stat. Ann. as applicable to the facts of this case. It provides (italics ours) that "Any person who has work done under contract on or about his premises which is an operation of the *usual* business which *he* there carries on shall be deemed an employer and shall be liable under this chapter to ■ such contractor, his subcontractors, and their employees, when injured or killed on or about the premises of the employer while doing work which is in the *usual* course of *his* business."

Respondents' opinion shows the following facts. The water softener tank which exploded was a second-hand boiler, with a manhole on its side. The Laundry Company had employed the defendant Shamrod, an expert boiler maker, to weld a steel plate over this manhole and make another at the top of the boiler. Thereafter the employees of the Laundry Company installed the tank and tested it for leaks by turning on the city water at a pressure of 110 pounds per square inch, which the evidence showed was a high pressure. It was discovered that water was leaking and seeping from several places in the tank including the part around the plate that Shamrod had welded on the side of the tank.

The Laundry Company called in Shamrod for the purpose of testing the tank for leaks, and repairing them by caulking. Shamrod's original contract had not covered caulking. His employee, the deceased Green, found some of the leaks and stopped them. At the time of his death, he was scraping with a chisel at the welded seam around the plate when the tank blew up. This apparently being a defect in Shamrod's original welding job.

The Laundry Company had a stationary engineer named Walker, who was foreman of its maintenance men. Respondents' opinion states Walker's testimony tended to show that while he and an assistant could do caulking work on high pressure equipment, and had done it at other plants, yet it was dangerous and he did not do such work or permit his subordinates to do it for the Laundry Company, for fear that someone would be injured.

Respondents' opinion then states that the work of caulking was a simple operation done with simple tools; and that there was ample testimony from which it could be found that it was not specialized work but such as maintenance men could do, and which was customary

for maintenance men, such as employees of laundry companies. Next the opinion says [185 S. W. (2d) 1. c. 45 (3-6)] "The fact that no caulking had ever been done by the Laundry Company (and) that such work was being performed on high pressure apparatus . . . are not matters determinative of this issue." Then it says: "It makes no difference that caulking had never been done by the Laundry Company. It had never been done because it had never been necessary." And the third time the opinion states: "The fact that the Laundry Company had called in others to do work, if it did, of such general nature as that being performed by deceased is likewise not determinative of the matter. . . . It cannot be said that (one) is not within the act who sublets work which he or its employees are *capable* of doing and which is being done in connection with his or its usual business."

In our view, respondents' opinion has given a broader meaning to Section 3698(a) supra, than it will bear. The statute declares the operation performed by the workmen must be a part of the *usual* business which "he"—that is, the particular employer—carries on. It is not a question as to what business other employers usually carry on. Respondents so held in an earlier case, Pitts v. Maupin, 230 Mo. App. 221, 225, 88 S. W. (2d) 384, 386, saying that the word "business" is used in the statute in the sense of "any particular occupation or employment habitually engaged in, especially for livelihood or gain"; and that "the word, 'his' in the clause reading 'while doing the work which is the usual course of his business' plainly refers to the employer and not the employee."

This court in Perrin v. American Theatrical Company, 352 Mo. 484, 488, 178 S. W. (2d) 332, 334(1) likewise declared (italics ours): "If the work being done at the time of injury is not an operation of, or in the *usual* course-of, the business which the employer *customarily* carries on upon his premises, but is only incidental, ancillary, or auxiliary thereto, then"—the contractor or his employee is not a statutory employee. The decision further states "the chief purpose of provisions of this type is to protect the employees of subcontractors who are not financially responsible, and to prevent employers from relieving themselves of liability by doing through independent contractors what they would otherwise do through direct employees." It seems this could not occur if the operation was one which the employer never did do, himself, through his direct and immediate employees and was (as here) only done in connection with a new installation. Furthermore, it cannot be thought that Section 3698(a) means to penalize an employer who is willing ▮▮▮ to hire independent experts at his own expense to save his immediate employees from danger. For these reasons we think respondents' opinion contravenes the statute.

The record of the opinion of the Kansas City Court of Appeals in Green v. Shamrod is therefore quashed. All concur.