**Coney CRAIN, Plaintiff-Respondent and Plaintiff-Appellant,**

v.

**WEBSTER ELECTRIC COOPERATIVE, Defendant-Appellant and Defendant-Respondent.**

Nos. 10030, 10031.

Missouri Court of Appeals, Springfield District.

May 17, 1978.

Motion for Rehearing and Application to Transfer Denied June 12, 1978.

Harold J. Fisher, William H. McDonald, Woolsey, Fisher, Clark, Whiteaker & Stenger, Springfield, for defendant-appellant and defendant-respondent.

Bernard A. Barken, St. Louis, Turner White, III, Springfield, for plaintiff-respondent and plaintiff-appellant.

Before STONE, P. J., and HOGAN and FLANIGAN, JJ.

FLANIGAN, Judge.

This is an action for the wrongful death of Danny Allen Crain who was electrocuted on December 14, 1972, when he came into contact with a power line owned by defendant Webster Electric Cooperative ("Webster"). Danny was born June 28, 1952. Coney Crain, Danny's surviving father, is the plaintiff. A jury found in favor of plaintiff and the verdict was in the amount of $41,600. Defendant appeals.

It is necessary to consider four of defendant's "points relied on." The validity of any of the first three points would require outright reversal. The fourth, if valid, requires reversal and remand. This court finds that the first three points are not valid but that the fourth point is meritorious.

Defendant's first point is, in essence, that the trial court should have dismissed the action (and erred in not granting defendant's in-trial motions for that relief) because: (a) the petition failed to allege that Danny's mother "was unable, declined, or refused to join"[1] in the action and (b) the evidence was insufficient to show that Danny's mother was unable or declined or refused to join in the action.

The allegations of the petition included the following:

> *the father and mother,* natural or adoptive, who may join in the suit, and each shall have an equal interest in the judgment; or if either of them be dead, then by the survivor; *or if the surviving parents are unable or decline or refuse to join in the suit, then either parent may bring and maintain the action in his or her name alone, for the use and benefit of both such parents;* or"

---

1. Unless otherwise indicated, all references to rules are to Missouri Rules of Court, V.A.M.R., and all references to statutes are to RSMo 1969, V.A.M.S.

Section 537.080 sets forth who may institute actions for wrongful death. § 537.080(2) reads:

"(2) If there be no spouse or minor children or if the spouse or minor children fail to sue within one year after such death, *or if the deceased be a minor and unmarried, then by*

"2. That at the time of his death, the said Danny Allen Crain was an unmarried, minor child, and was survived by his father, the plaintiff, herein, and by his mother, Aline Bohling; that plaintiff brings this action on his behalf for the use and benefit of the said Aline Bohling, pursuant to the Revised Statutes of the State of Missouri, Section 537.080; that plaintiff had the sole care, custody and control of the said Danny Allen Crain, pursuant to a decree of divorce from the said Aline Bohling . . . ."

Prong (b) of defendant's first point will be examined first. Plaintiff's attorney Bernard A. Barken offered and the court received into evidence a copy of a letter dated March 5, 1974, which Mr. Barken sent to decedent's mother, Mrs. Aline Bohling. Material portions of the letter are set forth below.[2]

Mr. Barken testified that the letter was sent to Mrs. Bohling by certified mail. The envelope containing the letter was accorded certified mail number 641861. A copy of the return receipt for certified mail number 641861, bearing the signature "Mrs. Aline Bohling," was produced. The receipt showed the date of delivery to be March 8, 1974. Mr. Barken also testified, "I have received no written or oral response to the letter from Mrs. Bohling or from anyone else on her behalf."

Defendant made no objection to the admissibility of the foregoing evidence.[3] Defendant's attack, initiated below and renewed here, is upon its sufficiency. Defendant claims that the evidence is insufficient because it fails to show (1) "that Mrs. Bohling's address was in fact that which was shown on the letter"; (2) "that the letter was mailed (how, when and where)"; and (3) "that the postage was prepaid."

Defendant's reply brief in this court withdraws, at least tacitly, ground (1) and rightly so because one of *defendant's* exhibits showed Mrs. Bohling's address to be that stated in the letter.

■ Grounds (2) and (3) are also unavailing. Testimony by Mr. Barken that the letter was sent to Mrs. Bohling by certified mail was equivalent to a statement by the witness that it was properly addressed,

---

**2.** The letter informed Mrs. Bohling that her former husband (plaintiff) had employed attorney Barken to sue the defendant for Danny's death; that the action had been filed in the Circuit Court of Webster County, that a copy of the petition was enclosed; that the attorney had assumed that if Mrs. Bohling "had wanted to take part in this case, or be named as a plaintiff along with Mr. Crain . . . that I would have heard from you or a lawyer on your behalf by this time." The letter continued: "However, in order to be certain that there are no misunderstandings, and to be sure that everything is in proper order prior to the trial, I am writing you now so that I can verify your position. Accordingly, I would like to hear from you, or an attorney on your behalf, by April 1, 1974. If I do not hear by that date, I will assume that you are declining to join in the suit. . . . You should not take the April 1st date as having any legal significance since I have selected it arbitrarily so that I can have some assurance of knowing your position substantially before the trial in order to have time to be properly prepared and advise the court. Please understand that I am not undertaking to give you any legal advice with reference to your rights or position concerning the death of your son in the above case. If you have any questions or if anything is not clear, you should seek your own counsel if you have not already done so. I will be more than happy, of course, to supply him with any information I have."

The letter also stated that Mr. Barken thought the case would be tried "sometime in September" 1974. The trial took place in January 1975.

**3.** The evidence under discussion was received after defendant filed its motion for a directed verdict at the close of plaintiff's evidence. One of the grounds of that motion was "that the plaintiff is not the proper party to singularly, alone, bring this cause of action."

Plaintiff's counsel requested and received leave of court to reopen plaintiff's case. Defendant objected to the *reopening* but the propriety of the court's action in permitting reopening was not challenged in defendant's post-trial motions nor on this appeal.

"[I]t is well established in Missouri that the trial court may in its discretion allow a case to be reopened to afford a fair hearing of the issues before him. A litigant should not be precluded from offering additional evidence simply because counsel has rested his case. This applies where, as here, the reopening of the case is allowed after a motion to dismiss the action has been filed by the defendant." *Conley v. Dee,* 246 S.W.2d 385, 387[6–9] (Mo. App.1952).

stamped and deposited in a proper place for the receipt of mail. *J. L. Price Brokerage Co. v. Chicago R.I. & P. Ry. Co.,* 207 Mo. App. 8, 230 S.W. 374, 377[3] (1921). That case also states that "such testimony is sufficient to raise a presumption that it was received in due course." Additionally, the return receipt itself was prima facie evidence of the delivery of the letter on the date shown on the receipt, 39 U.S.C.A. § 5013; 39 U.S.C.A. § 5010. Defendant offered no evidence to the contrary.

■ Plaintiff's evidence of the fact that Mrs. Bohling declined to join in the action was not insufficient for any of the reasons assigned by defendant. Accordingly there is no merit to prong (b) of defendant's first point. This determination in effect disposes of prong (a).

Rule 55.33(b) provides, in pertinent part:

"(b) *Amendments to Conform to the Evidence.* When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

■ The issue of Mrs. Bohling's declining to join in the action was tried by the implied consent of the parties, defendant having made no objection to the evidence on that issue.[4] Accordingly the issue is to be treated in all respects as if it had been raised in the pleadings. Rule 55.33(b). The result of the trial of that issue is unaffected by the failure to amend the pleadings so as to cause them to conform to the evidence.

Defendant made no objection to the evidence under discussion either on the ground that it was not within the issues made by the pleadings or on any other ground. Whether the petition in its original form, unaided by the mentioned evidence, would have been insufficient need not be, and is not, ruled.[5]

Defendant's first point has no merit.

Defendant's second point is that the trial court erred in failing to sustain defendant's motion for a directed verdict, filed at the close of all of the evidence, because the evidence showed *as a matter of law* that

4. Rule 55.33(b) is the same as Rule 15(b) of the Federal Rules of Civil Procedure. With respect to the "implied consent" mentioned in Rule 15(b), a leading authority states: "Consent generally is found when evidence is introduced without objection." Wright and Miller, Fed. Prac.& Proc., Vol. 6, § 1493, p. 463.

5. "'A party suing [under the wrongful death statute] must bring himself in his pleading and proof strictly within the statutory requirements necessary to confer the right. Otherwise his petition states no cause of action'." *Wessels v. Gipfel,* 522 S.W.2d 653, 654 (Mo.App.1975); see also *State ex rel. Jewish Hospital, Etc. v. Buder,* 540 S.W.2d 100, 104[1–5] (Mo.App. 1976).

Nevertheless the fact is that Missouri courts have construed some wrongful death petitions, technically imperfect, to be sufficient. See, for example, *Acton v. Shields,* 386 S.W.2d 363, 365[1] (Mo.1965); *Slater v. Kansas City Terminal Ry. Co.,* 271 S.W.2d 581 (Mo.1954); *Baird v. Citizens Ry. Co.,* 146 Mo. 265, 48 S.W. 78 (Mo.1898); *Kern v. United Rys. Co. of St. Louis,* 214 Mo.App. 232, 259 S.W. 821 (1924); *Jackson v. Lincoln Min. Co.,* 106 Mo.App. 441, 80 S.W. 727 (1904).

Even in cases where the appellate court has held the petition to be insufficient, it has ordered reversal and remand rather than outright reversal. *Nelms v. Bright,* 299 S.W.2d 483 (Mo. banc 1957); *Wente v. Shaver,* 350 Mo. 1143, 169 S.W.2d 947 (1943); *Lee v. St. Louis Public Service Co.,* 337 Mo. 1169, 88 S.W.2d 337 (1935); *O'Donnell v. Wells,* 323 Mo. 1170, 21 S.W.2d 762 (1929); *McIntosh v. Missouri Pacific Ry. Co.,* 103 Mo. 131, 15 S.W. 80 (1891); *Lynch v. St. Louis Public Service Co.,* 261 S.W.2d 521, 524[5] (Mo.App.1953).

Danny was a "borrowed servant" of defendant, and that plaintiff's sole remedy is that afforded by the Workmen's Compensation Law.

When a defendant in a common law action for damages asserts that the action will not lie because the injured person (or, as here, the decedent) was the "borrowed servant" of the defendant, the defense is an affirmative one and the burden rests upon the defendant to plead and prove it. *Dunn v. General Motors Corp.*, 466 S.W.2d 700, 703[2] (Mo.1971); *Sippel v. Custom Craft Tile, Inc.*, 480 S.W.2d 87, 91[4] (Mo.App.1972). If the evidence showed, as a matter of law, that Danny was a "borrowed servant" of defendant, the trial court should have directed a verdict for defendant for, in that situation, plaintiff's "exclusive remedy was under the Workmen's Compensation Act. That act, if applicable, would supersede any right plaintiff might otherwise have had to maintain an action at common law." *Walton v. United States Steel Corporation*, 362 S.W.2d 617, 620 (Mo. 1962); *Sippel, supra*, 480 S.W.2d at p. 89; § 287.120(2).

In reviewing the trial court's ruling on defendant's motion for a directed verdict this court must view the evidence in its light most favorable to the plaintiff and plaintiff is to be given the benefit of all reasonable inferences. *Black v. Kansas City Southern Ry. Co.*, 436 S.W.2d 19, 23[1] (Mo. banc 1968). Defendant's evidence must be disregarded unless it aids plaintiff's case. *Kaelin v. Nuelle*, 537 S.W.2d 226, 232[6] (Mo.App.1976); *Anderson v.*

*Welty*, 334 S.W.2d 132, 133[1, 2] (Mo.App. 1960). A trial court "is ordinarily not justified in directing a verdict in favor of the party having the burden of proof, when the evidence relied on consists of oral testimony." *Price v. Bangert Brothers Road Builders, Inc.*, 490 S.W.2d 53, 57[5] (Mo.1973); see also *Young v. Hall*, 280 S.W.2d 679, 682 (Mo.App.1955).[6]

"A [trial] court should never withdraw a question from the jury, unless 'all reasonable men, in the honest exercise of a fair, impartial judgment, would draw the same conclusion from the facts which condition the issue.' . . . Where there is uncertainty arising 'from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury.'" *Walton v. United States Steel Corporation*, 362 S.W.2d 617, 621[2] (Mo. 1962).

Our supreme court has said: "The essential elements constituting a 'borrowed servant' relationship have been stated several times. Essentially, they are: '(a) consent on the part of the employee to work for the special employer; (b) actual entry by the employee upon the work of and for the special master pursuant to an express or implied contract so to do; and (c) power of the special employer to control the details of the work to be performed and to determine. how the work shall be done and whether it shall stop or continue.' *Ellegood v. Brashear Freight Lines, Inc.*, 236 Mo.

---

**6.** "It is next contended that 'advice of counsel is a complete bar to this suit since Aetna instituted the previous civil action on advice of counsel.' This contention is based on certain conclusions elicited from the witness Finnegan on his cross-examination by defendant's counsel, . . .

"The first reason why it would have been improper to direct a verdict for defendant on the strength of this showing is that the defense of advice of counsel is affirmative in nature, and one on which the defendant had the burden of proof. . . . Had the same facts been developed by defendant as a part of its own case, and plaintiff had put on no countervailing evidence, no one would contend that defendant

would have been entitled to a directed verdict thereon. And so, conversely, the circumstance that testimony tending to support an affirmative defense comes from the lips of a witness called by the plaintiff is not to be treated in any sense as a judicial admission by such plaintiff of the truth of the facts thus shown, but the credibility of that witness still remains for the jury." *Hughes v. Aetna Ins. Co.*, 261 S.W.2d 942, 951 (Mo.1953).

Compare, however, 32A C.J.S. Evidence § 1040(1), p. 768, where it is said: "The rule that a party is bound by the uncontradicted evidence of his witness applies as to testimony elicited from his witness by the adverse party on cross-examination."

App. 971, 162 S.W.2d 628 (1942); *Feldmann v. Dot Delivery Service*, 425 S.W.2d 491 (Mo.App.1968). Slightly differently worded definitions have been stated, *Dickhaut v. Bilyeu Refrigerated Transport Corp.*, 441 S.W.2d 54, 1. c. 57 (Mo.1969), 1A Larson's Workmen's Compensation Law, § 48.10, but essentially the requirements as variously stated coincide." *Ballard v. Leonard Brothers Transport Co., Inc.*, 506 S.W.2d 346, 350[2] (Mo.1974).

Most of the evidence to be recounted emanated from plaintiff's witnesses. There are few, if any, factual disputes but the parties differ on what conclusions must be drawn from the evidence which underlies the borrowed servant issue.

■ Plaintiff argues that defendant's failure to offer an instruction on that issue constituted an abandonment or waiver of defendant's second point. That argument is unsound. If the facts are not in dispute, and if they lead to but one conclusion, the question of whether Danny was defendant's borrowed servant was one of law for determination by the court, as presented to it by defendant's motion for directed verdict, and defendant did not waive or abandon the point by not submitting it to the jury. *Daniels v. Krey Packing Co.*, 346 S.W.2d 78, 81[2] (Mo.1961); *Ballard v. Leonard Brothers Transport Co., Inc.*, supra, 506 S.W.2d at 352.

Defendant Webster is a Missouri corporation engaged in the business of selling and distributing electrical energy. Such was Webster's "usual business" according to its response to a request for an admission. Its principal office is located at Marshfield, Missouri, and it serves Webster County and adjoining counties.

On the night of Monday, December 11, 1972, an ice storm occurred which caused extensive damage to Webster's electrical system and necessitated an unusual amount of repairs.

On the morning of December 12 Webster's "manager," Thomas Hyde, made telephone calls to five electric cooperatives or electric companies requesting them to "send out whatever available manpower and equipment that could be spared." Frazier Brothers, Inc. ("Frazier") was one of the five.

The oral agreement, made by telephone, between Webster and Frazier did not specify or designate the persons who were to perform the work to be done. Webster did not specifically request Danny to be one of the persons furnished. There was no specific agreement as to who was to furnish the tools and equipment to be used in the repair work but it was assumed, "as is customary," that each workman would provide his personal equipment and Frazier would furnish "all additional equipment that could be spared." The remainder of the equipment was furnished by Webster.

According to Hyde, Webster was not engaged in the business of repairing broken lines "as such"; "not as a business, it's incidental to our business."

Lyndell Frazier, president of Frazier, testified that the principal business of Frazier was constructing and rebuilding power lines. Ordinarily Frazier did not work on electric lines which were "hot" or energized.

Danny, who was 20 at the time of his death, had worked for Frazier for approximately six months. Danny first did unskilled labor for Frazier, but by December 1972 Danny "had worked into an apprentice lineman's position, started climbing poles and doing a little bit of line work." Danny's duties when working for Frazier did not include working on energized lines and Danny had had no experience working on such lines. Webster did not know anything about Danny's experience in working on or about transmission lines and made no inquiry concerning that subject.

Danny was one of seven Frazier employees supplied to Webster to assist in repairing the storm damage. Frazier's itemized bill to Webster, submitted after the accident, showed that Danny worked 46.5 hours (24 hours regular time, 22.5 hours overtime). The other six employees worked a total of 136 hours. Frazier billed Webster for the salaries which Frazier paid its seven employees. The bill also included items for

"payroll taxes and insurance," "operating overhead," "use of small tools and supervision," and the use for 18 hours of equipment consisting of a pickup and a digger.

Danny's work on the Webster repairs commenced on Tuesday, December 12, and ended, tragically, about 6:30 p. m. on Thursday, December 14, when he was killed by a shock which he received by grasping a fallen electrical line on the Webster transmission system.

Danny lived in Springfield. On the three days he worked on the Webster repairs Danny and other Frazier employees "rode back and forth" from Springfield to Marshfield in a pickup truck provided by Frazier. On Tuesday and Wednesday Danny worked with Phillip Ragsdale, who was employed by Webster and had been for 18 years. Ragsdale was the "number 3 man" in Webster's field force. Ragsdale testified that Danny was not expected to work on "hot lines."

On Thursday, December 14, Danny worked with Cecil Smith, who was Webster's line superintendent and the "number 1 man" in Webster's field force. According to Smith, who was one of plaintiff's witnesses, Danny told Smith that he would do what Smith instructed him to do and would not do anything unless Smith told him. Smith "would always give Danny instructions before Danny did anything."

On the evening of the tragedy Danny and Smith went to the accident scene, a few miles from Marshfield, in a pickup truck owned by Webster. Another truck, which was a "digger truck," arrived at the scene shortly thereafter. Riding in the digger truck were Ragsdale and Gary Atkinson, both employees of Webster.

The four men had previously been notified by radio that there was an "outage" in the area where the accident occurred. Smith and Danny had driven along the Webster transmission system looking for the outage. It was dark and Danny shined his spotlight "along the lines looking for any problems." Smith saw the fallen line and said to Danny, "There is our trouble." Smith parked the pickup nearby and await-ed the arrival of the digger truck. Smith and Danny stayed in the pickup until the other truck arrived. Smith did not then know that the fallen wire was "hot."

Upon the arrival of the digger truck Smith got out of the pickup and went to the digger truck where he conversed with Ragsdale for three to five minutes. During that time, Danny got out of the pickup. None of the three Webster employees saw Danny do so, but about five minutes after the digger truck arrived, Danny was "discovered missing." A search for Danny ensued and Smith found Danny lying near the bottom of the pole from which the broken wire hung, about 60 feet from the digger truck. Danny's hands bore marks of electrical burns. The hot wire was "hanging from the top of the pole down to the ground" and it was emitting sparks. Efforts to revive Danny were to no avail and he was pronounced dead on his arrival at a nearby hospital.

Danny had brought his own personal tools, "such as linemen usually carry," when he began the Webster repair work. Danny was not on Webster's payroll at the time of his death but was on Frazier's payroll.

■ The elements of a "borrowed servant" relationship, as set forth in *Ballard*, supra, 506 S.W.2d at 350, are: (a) consent on the part of the employee to work for the special employer; (b) actual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract so to do; and (c) power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue.

Dispositive of defendant's second point, is whether element (a) is established, *as a matter of law*, by the evidence. As plaintiff points out, each of the three elements of the borrowed servant relationship, as set forth in *Ballard*, supra, must be shown. Even if, which need not be decided, the evidence shows the existence of elements (b) and (c), it does not necessarily follow that element (a) is shown. To hold other-

wise would be to say that there was no need for element (a) to be included in the *Ballard* formula.

With regard to the consent required by element (a), the court, in *Ballard*, supra, 506 S.W.2d at 351 said: "The consent of the employee may be implied from his action in proceeding with the employment, his general acceptance of it, and his obedience to orders . . . although the consent must be deliberate and informed."

In addition to *Ballard*, Missouri cases discussing the factor of "consent on the part of the employee to work for the special employer" include: *Brown v. Missouri Lumber Transports, Inc.*, 456 S.W.2d 306 (Mo.1970); *Wright v. Habco, Inc.*, 419 S.W.2d 34 (Mo.1967); *Patton v. Patton*, 308 S.W.2d 739 (Mo.1958); *Andra v. St. Louis Fire Door Company, Inc.*, 287 S.W.2d 816 (Mo.1956); *Stroud v. Zuzich*, 271 S.W.2d 549 (Mo.1954); *Feldmann v. Dot Delivery Service*, 425 S.W.2d 491 (Mo.App.1968); *Schepp v. Mid City Trucking Co.*, 291 S.W.2d 633 (Mo.App.1956); *Wittgrove v. Green Lea Dairies, Inc.*, 223 S.W.2d 114 (Mo.App.1949); *Ellegood v. Brashear Freight Lines, Inc.*, 162 S.W.2d 628 (Mo.App.1942).

*Ballard, Wright, Andra*, and *Ellegood* were tort cases. In each of them the defendant asserted the affirmative defense that the action would not lie because plaintiff was its borrowed servant. In *Andra* the borrowed servant relationship was found, as a matter of law, not to exist. Andra was injured while helping defendant's regular employees raise a door and the duration of the work which Andra did for defendant was 15 to 30 minutes. In *Ballard, Wright,* and *Ellegood* the borrowed servant relationship was found, as a matter of law, to exist. *Ellegood* and *Ballard* involved truck leases where plaintiff was held to be the borrowed servant of the lessee. It is not clear how long the borrowed servant relationship existed in *Ellegood*, but in *Ballard* it had lasted two years before the injury occurred. In *Wright* the relationship between plaintiff and defendant lasted 44 days before plaintiff was injured during the work of cleaning defendant's building. In *Ballard, Wright,* and *Ellegood* the consent of plaintiff, although implied consent, was found to exist as a matter of law. It is *Ballard* and *Wright* upon which defendant places its principal reliance.

In *Ballard* the court pointed out that the business of plaintiff's regular employer was to furnish tractors and drivers to others, principally to defendant. The court said, at p. 352: "Plaintiff knew this and, when employed, immediately entered into the regular operation of tractors for [defendant], under the direction of [defendant's] terminal manager. He clearly consented to that arrangement . . . .. This exclusive work for [defendant] continued for two years . . . .."

In *Wright* plaintiff's regular employer was Manpower, Inc. The court, at p. 36, stated: "Plaintiff knew when he was hired by Manpower that all of his work would actually be performed for various customers of his general employer. The very fact that he entered into an employment arrangement of that nature would constitute a general consent to work for special employers such as defendant."

*Brown, Patton, Stroud, Feldmann, Schepp,* and *Wittgrove* were workmen's compensation cases. In *Brown* and *Wittgrove* the defense was that plaintiff was the borrowed servant of a non-party. In *Patton, Stroud, Feldmann* and *Schepp* there were two defendants, one claiming that the plaintiff was the borrowed servant of the co-defendant.

In *Patton* and *Feldmann* the relationship of borrowed servant was found to exist. The ruling in *Patton* was not that the relationship existed as a matter of law but that the Industrial Commission was justified in finding as a matter of fact that the relationship existed and that the plaintiff had impliedly consented to it. *Patton* involved the leasing of a truck and the duration of the relationship between the borrowed servant and the special employer was three months. In *Patton* the borrowed servant had "passed all requirements for a driver of explosives to [the special employer's] satisfaction, and was a driver approved by [the

special employer]. This was sufficient evidence to sustain a finding he consented to render services for and obey the directions of [the special employer] in hauling explosives."

In *Feldmann* the employee's consent to the borrowed servant relationship was "conclusively established." The court emphasized that the claimant had operated a truck in the service of the special employer for a period of more than five years and had followed the latter's instructions throughout that period. It was shown that the employee had applied "for the particular job of driving the truck for [the special employer] and that he was hired 'to drive on this particular contract' that [the regular employer] had with [the special employer]."

In *Brown, Stroud, Schepp* and *Wittgrove* the borrowed servant relationship was found not to exist. In *Brown* and *Stroud* the non-existence of the relationship was based on a finding of fact. In *Schepp* and *Wittgrove* the non-existence of the relationship was found as a matter of law. The duration of the relationship between plaintiff and the alleged special employer was one day in *Brown*, one day in *Stroud*, one day in *Schepp*, and 10 or 11 days in *Wittgrove*. *Wittgrove*, however, clearly involved the lack of consent on the part of the employee because the employee was unaware of the existence of the alleged special employer.

*Schepp* stresses the importance of the consent factor. The court in *Schepp*, at p. 642, says: "While 'consent' to work for the special employer may be inferred from an employee's acceptance of and obedience to orders given him by the 'special employer' . . . such 'acceptance of and obedience to orders' must be considered in connection with all the facts and circumstances in evidence, and the mere physical act of performing some service that is the 'work of and for' the special employer, pursuant to the command of the general employer, does not alone justify the inference of 'consent.' "

▮ The formula in *Ballard* does not require that the relationship between the employee and the special employer exist for a certain length of time before it blossoms into a borrowed servant relationship. Nevertheless, when the issue has been presented, the courts almost invariably have pointed out how long the relationship had existed and it appears that its duration is an evidentiary factor which may be taken into consideration in determining whether or not the three elements set forth in *Ballard* have been shown.

In *Andra*, supra, 287 S.W.2d at p. 819 the court pointed out that if a borrowed servant relationship exists, "most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have been very vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit. . . ." The same language appears in *Stroud*, supra, 271 S.W.2d at p. 556. *Andra*, at p. 821, states that "consent cannot be inferred merely from the fact that the employee obeyed the commands of his master in entering the services of another."

In *Ballard*, 506 S.W.2d at p. 352 the court said the issue of employment "usually is in the first instance one of fact."

▮ As might be expected, neither plaintiff nor defendant, in their respective and excellent briefs, has cited any case factually similar. Danny's work for defendant was brief in duration. The conditions which occasioned it were unusual. There is no showing that its actual duration was either predicted or predictable. Several of his co-employees worked fewer hours for Webster. At the time of the casualty itself he came into contact with a hot line, a situation, according to the evidence, not within the contemplation of anyone. There was no showing of an express consent on Danny's part to the creation of a special relationship between him and Webster. There was no showing of any express consent of the "informed and deliberate" variety.

The question is a close one. It may well be that the evidence is sufficient to *permit* a finding, *as a matter of fact*, of element (a), Danny's consent, but may it properly be said that the evidence *compels* that finding *as a matter of law*? This court answers that question in the negative. It follows that the trial court did not err in the manner asserted in defendant's second point and the latter has no merit.

Defendant's third point is that the trial court erred in failing to sustain defendant's motion for directed verdict, filed at the close of all of the evidence, because the evidence showed *as a matter of law* that Danny was a "statutory employee" of defendant and that plaintiff's sole remedy is that afforded by the Workmen's Compensation Law.

■■■ When a defendant in a common law action for damages asserts that the action will not lie because the injured person (or, as here the decedent) was the "statutory employee" of the defendant, the defense is an affirmative one and the burden rests upon the defendant to plead it and prove it. *Greiser v. Western Supplies Company*, 406 S.W.2d 13, 16[1] (Mo.1966); *Miller v. Municipal Theatre Association of St. Louis*, 540 S.W.2d 899, 906[14] (Mo.App. 1976). If the evidence showed, as a matter of law, that Danny was the "statutory employee" of defendant, the trial court should have directed a verdict for defendant for, in that situation, plaintiff's exclusive remedy would be under the Workmen's Compensation Law. *Walton v. United States Steel Corporation*, 362 S.W.2d 617, 621[2] (Mo. 1962); *Brown v. Gamble Const. Co., Inc.*, 537 S.W.2d 685, 689[9] (Mo.App.1976).

The principles governing appellate review of a trial court's ruling on a defendant's motion for directed verdict have been set forth under defendant's second point and are applicable here.

Section 287.040(1) reads: "Any person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on shall be deemed an employer and shall be liable under this chapter to such contractor, his subcontractors, and their employees, when injured or killed on or about the premises of the employer while doing work which is in the usual course of his business."

Although the term "statutory employees" is not found in § 287.040(1), "those contractors, subcontractors, and their employees who are thereby brought within its coverage are commonly referred to as 'statutory employees', that is, as employees who are to be deemed to occupy the status of employees only by virtue of express statutory provision designed to accomplish the remedial object of the act, but who in actual fact are under no legal relationship of master and servant with the employer who is arbitrarily made liable under the act." *Rucker v. Blanke Baer Extract & Preserving Co.*, 162 S.W.2d 345, 347 (Mo.App.1942).

"The purpose of [§ 287.040(1)] is to prevent an employer from evading workmen's compensation liability by hiring independent contractors to perform the usual and ordinary work which his own employees would otherwise perform." *Miller v. Municipal Theatre Association of St. Louis, supra*, 540 S.W.2d at 906.

■■■ Before one may properly be classified as a statutory employee, the following elements, extracted from § 287.040(1), must be shown: (1) the work was being done under contract, (2) the injury or death occurred on or about the premises of the alleged statutory employer, and (3) the injury or death happened while the alleged statutory employee was doing work in the usual course of business of the alleged statutory employer, that is, work which is an operation of the usual business which the statutory employer there carries on. *Wallace v. Porter DeWitt Construction Company*, 476 S.W.2d 129, 131[2] (Mo.App.1971); *Johnson v. Medlock*, 420 S.W.2d 57, 61[6] (Mo.App.1967); *Shireman v. Rainen Home Furnishers, Inc.*, 402 S.W.2d 64, 68[6] (Mo. App.1966).

"All three elements must be satisfied before an employee is held to be a statutory employee." *Ferguson v. Air-Hydraulics Company*, 492 S.W.2d 130, 135[5] (Mo.App.

1973). If the three elements are present, plaintiff was a statutory employee "whether or not plaintiff affirmatively consented to that relationship." *Anderson v. Benson Manufacturing Company,* 338 S.W.2d 812, 814 (Mo.1960); *Montgomery v. Mine La Motte Corp.,* 304 S.W.2d 885, 890[8] (Mo. 1957).

The initial inquiry is whether element (1) is present. This in turn involves the question of whether the arrangement between Webster and Frazier was the type of contract contemplated by element (1). Although the wording of § 287.040(1) is such that the injured person may be the contractor himself, as distinguished from one of his subcontractors or one of his employees, under the facts here Danny's relationship with Webster arose by reason of the Frazier-Webster arrangement rather than by reason of a Danny-Webster arrangement. If there was a contractor in the case at bar it was Frazier and not Danny.[7]

The evidence concerning the arrangement between Frazier and Webster is contained in the testimony of Webster's manager Hyde, introduced by plaintiff, concerning his telephone conversation with Lyndell Frazier, president of Frazier. That testimony is as follows:

"Q. What was the substance and the nature of your conversation with Mr. Frazier?

A. Of course, it wasn't recorded, or we have no actual facts to go on other than just memory, and, of course, that was some six, eight, nine months ago. As I recall, it was, 'Do you have some people, some equipment? Can you give us some help? We have systems down. We have a lot of people out of service. We have a lot of our systems down, poles broken off.' The damage was prevalent in just about all the areas in the areas which we serve. And, 'We need whatever you can send us in the way of men and equipment.'

Q. Did you discuss with Mr. Frazier what the price would be?

A. No.

Q. How payment would be made?

A. No, sir. Not at that time, no."

In *Ferguson v. Air-Hydraulics Company,* supra, 492 S.W.2d 130, plaintiff Ferguson was a truck driver employed by Ryder. Ryder had a contract with Ryerson under which Ryder leased a truck and supplied a driver (Ferguson) to Ryerson for the purpose of delivering goods. Plaintiff delivered some steel to the plant of defendant Air-Hydraulics Company. Plaintiff was injured while he was helping one of defendant's regular employees unload the steel. At p. 136 the court said:

"In examining the purposes of the statute and the elements which must be satisfied to make the employee Ferguson a statutory employee of Air-Hydraulics, we find that there was no contract within the meaning of § 287.040(1) to substantiate the conclusion that Ferguson was a statutory employee of Air-Hydraulics. Not every type of contract will suffice to satisfy that element of the statute. *The contract contemplated within the meaning of the statute must be a contract which delegates to another the usual operation of the employer's business. There is no evidence here that Air-Hydraulics at any time contracted out its unloading operation to Ryerson or Ryder or to anyone else. . . .*

*"The relationship existing between Air-Hydraulics and Ryerson Steel, to whom the driver and truck were leased, was that of buyer and seller rather than one of contract to unload. Under such circumstances Ferguson cannot be held to be a statutory employee."* (Emphasis added)

In *Shafer v. Southwestern Bell Telephone Company,* 295 S.W.2d 109 (Mo.1956), Shafer met his death by electrocution. At the time Shafer was an employee of Western Elec-

---

7. This is consistent with defendant's position in the trial court. At defendant's request the trial court gave Instruction No. 7 which submitted the defense of statutory employee. That instruction required the jury to find, among other things, that "Defendant and Frazier Brothers, Inc. entered into an agreement whereby Frazier Brothers, Inc.'s employees would be used by defendant."

tric Company, a contractor employed by Southwestern Bell Telephone Company, ("Bell"). Shafer was lacing telephone cable, "an uncomplicated job," in Bell's building when he came into contact with a fuse panel which emitted the fatal shock.

Bell contended that it was entitled to a directed verdict because the evidence established that Shafer was an employee of an independent contractor doing work under contract on Bell's premises in the usual course of Bell's telephone business. The supreme court held that the trial court did not err in refusing to direct a verdict for Bell. At p. 115 the court said:

"The work of Shafer was being done on Bell's premises. Although it is clear that Shafer was an employee of Western Electric Company which frequently does work under contract for Bell, *the evidence does not disclose the work,* of which cable lacing apparently was a part, *to be done by Western Electric Company under the contract. We cannot determine that the work being done under contract by Western Electric Company, as distinguished from the specific act being done by Shafer,* was an operation of the usual business carried on by Bell on the premises."

. . . "In *State ex rel. Long-Hall Laundry and Dry Cleaning Company v. Bland,* 354 Mo. 97, 188 S.W.2d 838, 842, it was said that the statute declares the operation performed by the workman must be a part of the usual business which the particular employer carries on. *The term 'operation performed by the workman' as used in the above cited case does not mean the specific act the workman was doing at the time he was injured, but it means the operation of the workman done in performing ' "work done under contract," ' which work is ' "an operation of the usual business which he [in this case Bell] there carries on." ' "*

In *Shafer* the defense of statutory employee failed because the evidence failed to show what work was to be done by Western Electric Company under Western's contract with Bell.

In *Wright v. Habco, Inc.,* 419 S.W.2d 34 (Mo.1967) plaintiff, a regular employee of Manpower, Inc., was injured when he fell from a scaffold while working in defendant's building. Defendant argued successfully, as a defense to the tort action, that plaintiff was its *borrowed servant.* Plaintiff sought to avoid that defense by relying upon the provisions of § 287.040(3). Subsection (3) of § 287.040 carves out exceptions to the provisions of § 287.040(1) which deals with "statutory employees." The following language in *Wright* is instructive here:

"Plaintiff also contends that his claim against defendant would not be governed by the compensation law because of the exclusionary provisions of § 287.040(3), which reads as follows: 'The provisions of this section shall not apply to the owner of premises upon which improvements are being erected, demolished, altered or repaired by an *independent contractor* but such independent contractor shall be deemed to be the employer of the employees of his subcontractors and their subcontractors when employed on or about the premises where the principal contractor is doing work.' (Italics ours.) He says that Manpower was an independent contractor *engaged to clean up defendant's building. That contention is based upon an erroneous factual premise and is without merit. There is no evidence to support a finding that Manpower contracted to clean defendant's building. It merely furnished two laborers to do any type of general labor defendant might direct them to do.* In that situation Manpower was not an independent contractor and § 287.040(3) has no application to this case." (Emphasis added) *Wright,* supra, at p. 38.

The testimony of plaintiff's witness Hyde, set forth above, does not compel the conclusion that there was a contract between Webster and Frazier whereby Frazier was to do work under the contract. In the language of *Ferguson,* supra, there was no contract by which Webster delegated to Frazier the usual operation of Webster's business. If there had been such a contract, the appropriate inquiry would have

been, in the language of *Shafer,* supra, the nature of the work to be done by Frazier under the contract, as distinguished from the specific act being done by Danny. In the language of *Wright,* supra, there is no evidence to support a finding that Frazier contracted to repair Webster's downed lines, or to do any other work of which repairing downed lines was a part. Frazier merely furnished laborers, including Danny, to do what Webster might direct them to do.

This court holds that the record does not establish, as a matter of law, that Danny was a statutory employee of Webster within the scope of § 287.040(1). Accordingly it is unnecessary to determine, had Danny been within such scope, whether the exclusionary provisions of § 287.040(3) would come into play on this record.

Defendant's third point has no merit.

Defendant's fourth point is that the trial court erred in giving Instruction No. 4, a verdict-director submitted by plaintiff, for the reason that it omitted a necessary element of the ground of liability submitted. The instruction reads:

"Instruction No. 4

Your verdict must be for plaintiff, Coney Crain, if you believe:

First, that the broken electric line of defendant in the area where Danny Allen Crain was working was energized and as a result persons coming into contact with said line would be exposed to danger, and

Second, defendant knew or by using ordinary care could have known of such danger, and

Third, defendant failed to use ordinary care to warn Danny Allen Crain of it, and

Fourth, as a direct result of such failure, Danny Allen Crain, died, unless you believe plaintiff, Coney Crain, is not entitled to recover by reason of Instruction No. 7." [8]

Defendant contends that the instruction is erroneous in failing to require a finding that Danny lacked both actual and constructive knowledge of the dangerous condition. Defendant suggests that the missing element should have been included in language similar to Paragraph Second of MAI 22.03 (Verdict-Directing—Invitee Injured) which reads: "Second, plaintiff did not know and by using ordinary care could not have known of this condition."

Where a business invitee sues a landowner for personal injuries arising out of a dangerous condition of the premises, and the defendant's liability is submitted upon a failure to warn plaintiff of such condition, the plaintiff's verdict-directing instruction must, by appropriate language, require the jury to find that the plaintiff lacked actual and constructive knowledge of the dangerous condition. Omission of that element renders the instruction fatally defective. *Brozovich v. Brozovich,* 429 S.W.2d 330, 333[4] (Mo.App.1968); *Cupp v. Montgomery,* 408 S.W.2d 353, 360[7] (Mo. App.1966); *Hoffman v. The Kroger Company,* 340 S.W.2d 152, 155[6] (Mo.App.1960); *Daggs v. Patsos,* 260 S.W.2d 794, 798[5] (Mo.App.1953); *Schwartz v. S. S. Kresge Co.,* 238 Mo.App. 1165, 185 S.W.2d 37, 40[8] (1944).

Both sides have cited *Housden v. E. I. Du Pont De Nemours & Co.,* 321 S.W.2d 430 (Mo.1959) where plaintiff, an employee of a trucking company, assisted in unloading his trailer at defendant's plant, under the control and supervision of the defendant's employees. The court there pointed out that the duty owed an independent contractor (or his employee) working on the premises of the contractee (that is, the land occupier) was "like unto the duty owed to an invitee." The court then said, at p. 434:

"In our case, however, although plaintiff was actually the employee of Tri-State, the evidence shows that defendants undertook to direct and control plaintiff in loading or in assisting in loading the trailer at defendant Du Pont's plant, and plaintiff had been directed by his employer to submit to the orders and directions of defendant Swift. Consequently, it would seem that plaintiff in this case, with respect to defendants'

8. Instruction No. 7 submitted defendant's affirmative defense of "statutory employee."

duty, stood *in the relation of an employee*, rather than an invitee, with consequent duty of defendants to exercise ordinary care in providing a reasonably safe place for work, and reasonably safe methods and appliances including adequate help for doing the work assigned plaintiff." (Emphasis added)

It should be noted that Instruction No. 4 is not based on a theory of breach of defendant's duty with respect to providing a reasonably safe place for work. The theory submitted is that of failure to warn of a dangerous condition as distinguished from creating that condition or permitting it to exist.

Plaintiff argues, in defense of Instruction No. 4, that Danny was young and inexperienced and that he may not have appreciated the extent of the danger. It is unnecessary to determine whether those contentions are factually sound, or whether a jury would have been justified in making such findings, had Instruction No. 4 so required. Danny's lack of actual and constructive knowledge of the dangerous condition was a condition precedent to the creation of defendant's duty to warn of that condition.

"[T]he reported cases leave no room for doubt but that a master has the duty to warn a youthful and inexperienced servant of danger incident to work he is required to do or operation of a machine he is directed to use, *where by reason of such youth and inexperience the servant is not aware of and does not appreciate the danger and the risk.*" *Wilson v. White*, 272 S.W.2d 1, 5 (Mo.App.1954). (Authorities cited) (Emphasis added). Similarly in 53 Am.Jur.2d Master and Servant § 166, p. 228 it is said: "The duty of the employer to warn and instruct young and inexperienced employees extends *only* to those dangers which he in the exercise of ordinary prudence has reason to believe *are not known to his employees and will not be discovered by them* in time to protect themselves from injury." (Emphasis added)

An employer is not bound to warn and instruct an employee as to dangers that are obvious and patent. *Green v. Sutton*, 452 S.W.2d 200, 206 (Mo.1970); *Johnson v. Keen*, 168 S.W.2d 952 (Mo.App.1943). " 'Where a servant knows and appreciates the dangers of his employment, the master is under no obligation to give warning and instructions thereof, and the same holds true where by the exercise of reasonable care the servant could have known of the dangers likely to be encountered by him." *Brooks v. Kansas City Gas Company*, 127 S.W.2d 427, 430 (Mo.1939).

"The fact that a servant was aware of the danger from which he suffered harm is not, strictly speaking, *a defense*, since after a servant acquires knowledge of a danger apart from statute, the master is under *no duty* to him either *to warn him* or to provide safe conditions of employment." Restatement of Agency, Second, Chapter 14, p. 489.

It is arguable that when the jury found that defendant's failure to warn had a causal connection with Danny's death it was implicit in that finding that Danny did not have actual knowledge of the information which a warning would have afforded. A failure to impart to him information which he already possessed could not have been a proximate cause of his death, so it was unnecessary to require the jury to make an express finding that he lacked actual knowledge. That argument overlooks the fact that Danny's constructive knowledge of the dangerous condition, if such he had, eliminates an affirmative duty on the part of defendant to give a warning.

The Missouri authorities previously cited support the view that a duty to warn did not arise unless Danny lacked actual and constructive knowledge of the information to be imparted by the warning. It was necessary for plaintiff to prove absence of such knowledge and to insert that element in his verdict-directing instruction. It was not incumbent upon the defendant to prove the presence of actual or constructive knowledge as an affirmative defense to a failure to warn submission.

Other attacks upon Instruction No. 4 need not be and are not considered. On

retrial plaintiff's counsel should also heed the requirements of the MAI 20.00 series. Plaintiff, by cross-appeal, raised two points which are rendered moot by the foregoing disposition of defendant's appeal and they need not be considered.

The judgment is reversed and the cause remanded.

All concur.

### On Plaintiff's Motion for Rehearing

 In his "Motion for Rehearing or to Modify Opinion" plaintiff seeks to uphold Instruction No. 4 by arguing that it was not necessary for the instruction to include the omitted element because "under the circumstances of this case, there was a presumption that Danny was in the exercise of due care at the time of the occurrence." Plaintiff asserts that the presumption "supplied the missing element as a matter of law."

Plaintiff's position is untenable. If, which need not be decided, Danny was entitled to the presumption of due care on this record, "still such presumption does not supply the place of evidence of defendant's negligence. 'It is not a presumption of defendant's negligence but one of deceased's freedom from contributory negligence. It does not relieve plaintiff from the burden of proving defendant's negligence. One presumption cannot be based upon another.' *Menteer v. Scalzo Fruit Co.,* 240 Mo. 177, 186, 144 S.W. 833, 836." *Katz v. North Kansas City Development Co.,* 215 Mo.App. 662, 258 S.W. 752, 758[7] (1924). See also *Darby v. Henwood,* 346 Mo. 1204, 145 S.W.2d 376, 380[7] (1940).

"Courts have disapproved of the use of the presumption of due care as proof of a causal connection between the negligence of a person other than the decedent and the death, or as evidence that the defendant was negligent." 22 Am.Jur.2d Death § 215, p. 761. To similar effect see 25A C.J.S. Death § 80(1), p. 814.

The presumption under consideration is of no aid to plaintiff in his task of proving the elements of his cause of action against defendant. Neither does it cure a verdict-directing instruction which omits such an element.

Plaintiff's motion is denied.